Discussion
Sufficiency of the evidence-causation
We first address Regent Care's second issue, which challenges the legal and factual sufficiency of the evidence to support a finding that Regent Care's negligence was a proximate cause of Detrick's injury.
To determine the legal sufficiency of the evidence, a court must "independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict." Gharda USA, Inc. v. Control Solutions, Inc. , 464 S.W.3d 338, 348 (Tex. 2015) (quoting Whirlpool Corp. v. Camacho , 298 S.W.3d 631, 638 (Tex. 2009) ). A court will conclude that there is no evidence to support a finding if:
(a) [there is] a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.
Gharda , 464 S.W.3d at 347 (quoting City of Keller v. Wilson , 168 S.W.3d 802, 810 (Tex. 2005) ).
A jury's finding is not supported by factually sufficient evidence if it "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." Cotter & Sons, Inc. v. BJ Corp. , 549 S.W.3d 715, 722 (Tex. App.-San Antonio 2017, pet. dism'd). The court considers and weighs "all of the evidence presented at trial in a neutral light, setting aside the verdict only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust." In re C.Z.B. , 151 S.W.3d 627, 630 (Tex. App.-San Antonio 2004, no pet.).
*759 Regent Care contends that the evidence is legally and factually insufficient to support the jury's finding that its negligence-the failure of its nurses to promptly alert Detrick's treating physicians of a significant change in his condition-was a proximate cause of Detrick's injury. Specifically, Regent Care challenges the sufficiency of the evidence to support a finding of cause-in-fact. See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue , 271 S.W.3d 238, 246 (Tex. 2008) (proximate cause includes both cause-in-fact and foreseeability).
"[C]ause in fact requires that the allegedly negligent act or omission constitute a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." Id. (internal quotation marks omitted). It cannot be established by mere conjecture, guess, or speculation. Id. Further, in a health care liability case, "plaintiffs are required to adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." Jelinek v. Casas , 328 S.W.3d 526, 532-33 (Tex. 2010) (quoting Kramer v. Lewisville Mem'l Hosp. , 858 S.W.2d 397, 399-400 (Tex. 1993) ). "Reasonable probability," however, "does not turn on semantics or on the use of a particular term or phrase." Burroughs Wellcome Co. v. Crye , 907 S.W.2d 497, 500 (Tex. 1995).
Finally, it is well-established that "a defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." Bustamante v. Ponte , 529 S.W.3d 447, 457 (Tex. 2017). "There may be more than one proximate cause of an injury." Id.
Regent Care argues that Dr. Coutinho and Dr. Cubillos had all of the information they needed to reach the correct diagnosis and simply failed to do so. In support of this argument, it first contends that the doctors admitted at trial that Detrick's chart reflected new onset incontinence.[2] This contention does not accurately reflect the doctors' testimony. Rather, the doctors acknowledged that Detrick's chart, read in light of information they learned in the course of litigation, shows that the incontinence he experienced while at Regent Care was new onset. Both clearly testified that, at the time they were treating Detrick, they were not aware that he had new onset incontinence, i.e. , that there was a significant change in his condition.
Regent Care next relies on expert testimony opining that Dr. Coutinho and Dr. Cubillos would not have correctly diagnosed Detrick's condition even if they had been aware of his new onset incontinence. But this testimony, being at odds with the doctors' testimony that knowing about Detrick's new onset incontinence would have made a critical difference in their differential diagnoses, merely raised a question of fact for the jury to resolve.
The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. United Parcel Service, Inc. v. Rankin , 468 S.W.3d 609, 615 (Tex. App.-San Antonio 2015, pet. denied). It may believe or disbelieve a witness's testimony, in whole or in part, and may resolve any inconsistencies in that testimony. Id. This court may not substitute its judgment for that of the jury, "even if the evidence would clearly support *760 a different result." Id. The jury acted within its discretion by weighing the credibility of Regent Care's experts and of the treating doctors, and by accepting the testimony of the latter.
In addition, the cases on which Regent Care relies to support its argument that knowledge of Detrick's change in condition would not have mattered, are distinguishable. See Stone v. Texas Home Mgmt., Inc. , No. 04-99-00359-CV, 2000 WL 1727315 (Tex. App.-San Antonio Nov. 22, 2000, pet. denied) ; Methodist Hospital v. German , 369 S.W.3d 333 (Tex. App.-Houston [1st Dist.] 2011, pet. denied).
The plaintiff in Stone alleged that the death of a group home resident was caused by the home's failure to provide a complete medical history to a hospital emergency room. But the emergency room doctor "did not identify any information he did or did not receive from [the home] that would have influenced or changed his diagnosis." Stone , 2000 WL 1727315, at *3. Plaintiff's expert witness similarly failed to "specify what information was missing or incorrect." Id. , at *4. In this context, this court held that the evidence conclusively established that the treating physician had all the information he needed to correctly diagnose the patient's condition. Id. In the present case, the testimony specifically identifies information that was missing and explains how it would have influenced or changed the treating physicians' diagnoses.
German is similar to this case in that it involved an allegation that nurses' failure to inform treating physicians of a trend in a patient's condition caused the patient's injury. 369 S.W.3d at 344-46. But unlike this case, those physicians testified that the allegedly missing information would not have caused them to change their course of treatment. Id. at 347-48. There was no question of fact concerning whether the doctors had all the information they needed because the doctors, themselves, testified that they did. This clearly differentiates German from this case.
Regent Care next contends that Dr. Coutinho's and Dr. Cubillos's testimony concerning what they would have done if they had been timely informed of Detrick's new onset incontinence is speculative and conclusory and, therefore, no evidence. "[T]estimony is speculative if it is based on guesswork or conjecture." Nat. Gas Pipeline Co. v. Justiss , 397 S.W.3d 150, 156 (Tex. 2012). It is conclusory if it "state[s] a conclusion without any explanation." Id.
Dr. Coutinho and Dr. Cubillos did not simply state conclusions without any explanation. Rather, they testified in definite terms about what they would have done and why. For example, Dr. Cubillos testified that the fact of new onset incontinence, coupled with symptoms such as numbness in the legs and back pain, "could very well point to there being a more serious issue going on, such as like spinal cord compression." If she had known of Detrick's new onset incontinence on December 4, it would have been a red flag that "definitely" would have figured into her differential diagnosis, and she "very likely" would have sent him to the hospital for an immediate MRI to see if there was any spinal cord compression. Dr. Cubillos also explained why, in the absence of this information, she did not suspect spinal cord compression.
Dr. Coutinho testified that, if he had known about Detrick's new onset incontinence, there is no doubt in his mind that he would have sent Detrick back to the hospital on November 28 or 29 for an MRI. Like Dr. Cubillos, he explained why he thought this additional evidence was a red flag for possible spinal cord injury and *761 why, without it, he did not investigate the possibility of such an injury.
In addition to the more pointed terms noted above ("definitely," "very likely," "no doubt"), Dr. Cubillos and Dr. Coutinho at some points in their testimony used the term "probably." Regent Care, relying on Columbia Medical Center v. Hogue , argues that this renders their testimony speculative. But the terms identified in Hogue as indicating speculation or conjecture were "perhaps" and "possibly." 271 S.W.3d at 246. "Probably" is not among the words the supreme court found to indicate conjecture or speculation. See Christus Spohn Health Sys. Corp. v. Cervantes , No. 13-10-00309-CV, 2011 WL 1159961, at *5 (Tex. App.-Corpus Christi Feb. 10, 2011, no pet.) (mem. op.) ("Christus's attempt to add 'probably' to the list of words indicating conjecture is obviously wrong."). "In fact, 'probability' with respect to causation is precisely the standard for recovery in an action under chapter 74." Id. The use of the word "probably" does not render Dr. Coutinho's and Dr. Cubillos's testimony speculative or rob it of its probative value.
It was within the jury's discretion to accept the testimony of the treating doctors, which established that the failure of Regent Care's nurses to immediately inform them of Detrick's new onset incontinence caused a delay in correctly diagnosing his condition. See Rankin , 468 S.W.3d at 615 (jury is sole judge of credibility of witnesses and weight to be given their testimony). Dr. Coutinho's and Dr. Cubillos's testimony constitutes more than a scintilla of evidence to defeat Regent Care's legal sufficiency challenge.
Regent Care has also failed to demonstrate that the jury's verdict is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." See Cotter & Sons , 549 S.W.3d at 722. It recites evidence demonstrating that the negligence of the settling defendants contributed to Detrick's injury, but that evidence does not negate the causal link between Regent Care's negligence and Detrick's injury. It is well-settled that an injury may have more than one proximate cause. Bustamante , 529 S.W.3d at 457. Regent Care's negligence need only have been a substantial factor in bringing about Detrick's injury. See ids="12386526" index="32" url="https://cite.case.law/sw3d/529/447/#p457">id. The evidence is factually sufficient to support the finding that it was.
Admission of expert testimony-reliability
In its first issue on appeal, Regent Care argues that the trial court abused its discretion by not excluding the testimony of Dr. Charles Grodzin concerning Detrick's past medical expenses. Regent Care urges that this testimony was unreliable, speculative, and conclusory. It then asserts that the remaining evidence is legally and factually insufficient to support the jury's award for past medical expenses.
A trial court, acting as evidentiary gatekeeper, has broad discretion to assess the relevance and reliability of expert testimony. Exxon Pipeline Co. v. Zwahr , 88 S.W.3d 623, 629 (Tex. 2002). Its decision to admit expert testimony is, therefore, reviewed for abuse of discretion. Id.
For expert testimony to be admissible, the expert must be qualified and his opinions must be relevant to the issues in the case and based on a reliable foundation. TEX. R. EVID. 702 ; Zwahr , 88 S.W.3d at 628. The inquiry into whether an expert's opinions are reliable focuses on the underlying principles, research, and methodology. Zwahr , 88 S.W.3d at 629. Those opinions may be deemed unreliable if there is "too great an analytical gap between the data the expert relies upon and the opinion *762 offered." Id. The role of the courts, however, is not to determine whether an expert's opinions are correct, only whether the analysis used to form those opinions is reliable. Id.
Detrick offered the testimony of Dr. Charles Grodzin to establish the amount of reasonable and necessary medical expenses he incurred in the past as a result of his neurological injury, as distinguished from medical expenses incurred as a result of his preexisting conditions. Regent Care contends that this testimony should have been excluded as unreliable because it was based on summaries prepared by Detrick's trial counsel. The record, however, reveals that Dr. Grodzin's opinions were based on far more than these attorney-compiled summaries.
Dr. Grodzin testified that he reviewed Detrick's medical records predating his December 2013 neurological injury and familiarized himself with Detrick's preexisting conditions. He reviewed Methodist Hospital's records from November 2013, immediately prior to Detrick's placement at Regent Care, as well as the hospital's records from the later surgery to remove Detrick's tumor. In addition, Dr. Grodzin reviewed records from Detrick's current primary care physician, ambulance services, and various care facilities where Detrick has resided since his injury. Dr. Grodzin also personally spoke to Detrick's daughter and current primary care physician, and reviewed the deposition testimony of Detrick's daughter and wife.
The attorney-compiled summaries about which Regent Care complains were created in accordance with specific instructions from Dr. Grodzin following his review of extensive Humana "SmartSummary" Monthly Reports detailing Detrick's medical expenses for the years 2015, 2016, and 2017. Dr. Grodzin testified that these underlying billing records are a reliable source for determining medical costs and are the types of records that would be relied on to determine reasonable and necessary costs associated with a particular injury.
Dr. Grodzin also testified that he reviewed the Humana SmartSummaries to determine who Detrick's providers were and what services were provided. He then asked Detrick's attorneys to prepare a month-by-month summary including the types of medical care, date, provider, facility, and services. He further requested that the summaries be segregated between related and unrelated expenses. He testified that he gave specific direction concerning this latter task:
I was very specific. I listed the specific types of problems, services, physicians, imaging, lab work, etc., in a very specific fashion. And I also said that if it wasn't clear that something - despite the fact that I may have listed it as related, if it was - for whatever reason, couldn't clearly be shown and it was thought to be unrelated, that it be excluded so that we didn't, you know, include things that were unnecessary or questionably related.
Dr. Grodzin further testified that he looked at the summaries provided by counsel and was "very satisfied" that his instructions had been followed. He did not think it was necessary to compare the summaries with the underlying billing records to ensure that his instructions had been implemented correctly because those instructions were "very clear."
Dr. Grodzin's methodology included personal review of extensive medical records, personal interviews and review of relevant deposition testimony, application of his professional experience and training, detailed instruction to Detrick's attorneys concerning how to segregate related and *763 unrelated medical expenses, and personal review of the resulting summaries to satisfy himself that his instructions had been followed. Regent Care argues, in essence, that this methodology is deficient because it does not include the additional step of comparing each summary with the underlying billing records. We disagree. Dr. Grodzin's failure to take the additional step advocated by Regent Care goes only to the weight of his opinions, not their admissibility. Christus Health v. Dorriety , 345 S.W.3d 104, 111 (Tex. App.-Houston [14th Dist.] 2011, pet. denied) (evidence of charges possibly relating to preexisting conditions did not negate expert testimony but, at most, raised a fact issue for the jury to resolve).
The issue before this court is not whether the segregation of related and unrelated charges is correct; it is whether the methodology Dr. Grodzin employed to segregate related and unrelated charges was reliable. See Zwahr , 88 S.W.3d at 629. We conclude that it was and that the trial court did not abuse its discretion by refusing to exclude Dr. Grodzin's testimony.
Admission of expert testimony-conclusory or speculative testimony
Regent Care next asserts that Dr. Grodzin's testimony should have been excluded as conclusory or speculative. As previously noted, testimony is conclusory if the witness "simply state[s] a conclusion without any explanation." Justiss , 397 S.W.3d at 156. It is speculative "if it is based on guesswork or conjecture." Id.
Regent Care contends that Dr. Grodzin did not provide any basis for including certain charges in his assessment of past medical expenses related to Detrick's neurological injury. Regent Care specifically complains of charges for treatment for pneumonia, chest x-rays, back pain, and a renal function panel. But the record reflects that Dr. Grodzin did explain why he considered these charges to be related to Detrick's neurological injury.
For example, Detrick suffered repeated urinary tract infections because he had a catheter, which was required because of permanent incontinence resulting from his neurological injury. Detrick would present with a fever, which would require a chest x-ray to determine whether other causes of fever exist, such as bronchitis or pneumonia. Dr. Grodzin opined that these x-rays would not be necessary but for Detrick's catheter-related urinary tract infections because Detrick would probably not be in the same clinical circumstances and the "infectious issue" would not come to light. The doctor went on to explain that a urinary tract infection may enter the bloodstream and spread to other parts of the body such as the lungs, causing pneumonia. Further, if a patient suffers multiple infections, the bacteria generally become resistant to antibiotics, making the patient susceptible to infection at other sites in the body. This testimony provides a basis for including charges for pneumonia and chest x-rays in assessing Detrick's past medical expenses.
Dr. Grodzin also testified that some of Detrick's preexisting conditions were aggravated by his neurological injury, particularly his back pain. While he did not specifically identify his basis for this conclusion, this testimony immediately followed his description of his qualifications, experience, review of Detrick's medical records, and conversations with Detrick's daughter and primary care physician. Failure to expressly tie the doctor's opinion concerning back pain to his training, experience, and factual review of Detrick's condition goes to the weight to be given his testimony. It does not render that testimony conclusory or speculative. See Justiss , 397 S.W.3d at 156 (defining conclusory and speculative testimony).
*764 Regent Care also asserts that Dr. Grodzin included a $11.82 charge for a renal function panel without explaining why he believed it to be related to Detrick's neurological injury, given Detrick's history of kidney disease. The record shows, however, that counsel for Regent Care asked Dr. Grodzin whether the charge was included or excluded, and whether the doctor had reviewed the specific physician progress note for that charge. The doctor responded that the charge was included and that he was sure he had seen the progress note because he had been through Detrick's medical records. He simply could not specifically recall that progress note. He was never asked why the charge was included or why he believed it to be related to Detrick's neurological injury. Without such an inquiry, Dr. Grodzin's prior testimony that he reviewed Detrick's medical records and gave specific instructions concerning the types of services and providers to be included as related charges provides sufficient basis for his inclusion of the disputed renal function panel.
Regent Care also challenges as conclusory Dr. Grodzin's opinion that Detrick would not have needed nursing care but for the neurological injury. It is uncontested that, as a result of Detrick's neurological injury, he is paraplegic and has permanently lost bladder and bowel function. There can be no serious dispute that these conditions require him to have nursing home care. On the other hand, there is no evidence that any of Detrick's preexisting conditions required him to have nursing home care. Rather, the evidence is that Detrick was mobile, continent, and living independently prior to the neurological injury, and that he planned to undergo a hip replacement and then return to his home. That Detrick required nursing home care because of his neurological injury is amply supported in the record. Any assumption that he would have required such care at some point in the future because of preexisting conditions would be speculative.
The only preexisting condition Regent Care identifies as potentially requiring nursing home care is the groin rash that caused postponement of his hip replacement surgery. Regent Care argues that there is evidence that Detrick's rash persisted and, therefore, he would have needed nursing home care even without the neurological injury because the rash would have precluded hip surgery. It asserts that Dr. Grodzin was therefore required to exclude the costs of nursing home care for the period during which the rash may have persisted. The record does not establish, however, whether Detrick's rash persisted for any significant period of time. It shows only that he suffered from a rash in June 2014, not necessarily the same rash. Regent Care's inquiry concerning Detrick's 2014 rash does not negate Dr. Grodzin's testimony that Detrick's need for full-time care at a nursing home facility is a result of his neurological injury and is not related to his preexisting conditions. It also does not render that testimony conclusory or speculative.
Finally, Regent Care challenges Dr. Grodzin's opinion concerning ambulance charges because he did not review the actual ambulance invoices from United Ambulance. The doctor testified, though, that he did review United Ambulance's records and related entries in Detrick's billing records. He testified that, from these sources, he was able to ascertain the reasonable and necessary cost of ambulance services related to Detrick's neurological injury. The failure to additionally review ambulance invoices goes to the weight of his testimony and does not render that testimony conclusory or speculative. See Justiss , 397 S.W.3d at 156 (defining conclusory and speculative testimony).
*765 Regent Care did not demonstrate that Dr. Grodzin's testimony was conclusory or speculative. The trial court did not abuse its discretion by refusing to exclude the testimony on those grounds.
Sufficiency of the evidence-past medical expenses
Regent Care's legal and factual sufficiency challenges to the evidence of past medical expenses depends on its assertion that Dr. Grodzin's testimony should have been excluded. Because that predicate argument fails, the legal and factual sufficiency arguments also fail.
Sufficiency of the evidence-future medical expenses
In its fourth issue on appeal, Regent Care challenges the legal and factual sufficiency of the evidence to support the jury's award for future medical expenses.
Texas follows the "reasonable probability" rule for damages for future medical expenses. Aguirre v. Soto , No. 04-16-00028-CV, 2016 WL 5922777, at *6 (Tex. App.-San Antonio Oct. 12, 2016, no pet.) (mem. op.). A plaintiff is not required to adduce expert testimony establishing such expenses to a reasonable medical probability. Id. Rather, a jury may assess damages for future medical expenses "based on the nature of the plaintiff's injuries, medical care rendered to a plaintiff before trial, and the condition of the plaintiff at the time of trial." Id.
Regent Care contends that the evidence to support an award of future medical expenses is insufficient because there is no evidence of Detrick's life expectancy. But the record reveals otherwise. Dr. Grodzin testified that Detrick's life expectancy is six to eight years. He based this opinion on his review of Detrick's medical records, Detrick's family history, discussions with Detrick's daughter and current treating physician, and his own extensive experience with geriatric patients. Another expert, Dr. Scott Shapiro, testified that Detrick's life expectancy is three to four years, or "at least four to five more years."
The testimony of Dr. Grodzin and Dr. Shapiro constitutes some evidence of Detrick's life expectancy. The jury was entitled to determine the credibility of these witnesses and the weight to be given their testimony, and to resolve any conflicts in Dr. Shapiro's testimony. See Rankin , 468 S.W.3d at 615.
Regent Care next challenges the evidentiary basis for the amount of future medical expenses awarded by the jury. Dr. Grodzin opined that Detrick would incur $250,000 per year for future medical expenses (in addition to stating a range of $150,000 to $300,000, or even as high as $500,000, per year), and an additional $75,000 to $100,000 per year for a private nurse. Regent Care contends that these opinions lack any explanation or basis. However, Dr. Grodzin testified that he based his opinion on his review of Detrick's medical history and his expectation that Detrick will require such care in the future. Indeed, it is undisputed that Detrick's paralysis and incontinence are catastrophic and permanent.
The jury's award of $3,000,000 for future medical expenses is within the range of figures provided by Dr. Grodzin. In any event, Dr. Grodzin's expert testimony is not critical to affirming the jury's award. See Aguirre , 2016 WL 5922777, at *6. The jury was entitled to consider that Detrick was rendered permanently paralyzed and incontinent, had undergone extensive medical treatment in the past, and, at the time of trial, was not only still paralyzed and incontinent, but destined to spend the rest of his life in that condition. See index="50" url="https://cite.case.law/citations/?q=2016%20WL%205922777">id. (noting non-expert factors a jury may consider to determine future medical expenses). The evidence is legally and factually sufficient *766 to support the jury's award for future medical expenses.
Sufficiency of the evidence-loss of household services
Regent Care's third issue on appeal challenges the legal and factual sufficiency of the evidence to support the jury's award for loss of household services, both past and future.
The jury was asked to determine an amount of damages for loss of household services to be awarded to Detrick's wife, Carolyn. "Household services" were defined as "the performance of household and domestic duties by a spouse to the marriage." The jury was separately asked to assess damages for loss of consortium. "Consortium" was defined as "the mutual right of the husband and wife to that affection, solace, comfort, companionship, society, assistance, sexual relations, emotional support, love, and felicity necessary to a successful marriage."
In the absence of an objection to a charge instruction, the sufficiency of the evidence is weighed against "the factors submitted in the charge to determine whether evidence supports both the existence of damages and the amount awarded." Sw. Energy Prod. Co. v. Berry-Helfand , 491 S.W.3d 699, 713 (Tex. 2016) ; see Seger v. Yorkshire Ins. Co. , 503 S.W.3d 388, 407 (Tex. 2016). Regent Care objected to the inclusion of damages for loss of household services on the ground that Detrick was conflating that item of damages with loss of consortium. No party, however, objected to the definition of "loss of household services" contained in the charge. Thus, this court's sufficiency review is limited to evidence of "the performance of household and domestic duties by a spouse to the marriage."
Carolyn and Robert Detrick both testified that, while the couple lived together in their home, she would take care of the inside of the house and he would take care of the outside. Detrick also testified, though, that he had not mowed the yard since 2004 and that they had employed a yard man since that time. The only other household or domestic chore identified in the record as having been performed by Detrick was cooking.
Carolyn has trans global amnesia, a condition that occasionally causes her to not know where she is or what to do.[3] She lived on her own for a year and a half after Detrick became paralyzed, and then moved into Independence Hill, an independent/assisted living community. She testified that she made this move because she had no social life, had to fix her own meals, and had to drive herself, and because her daughters did not like her being alone. The record reflects that the cost of Carolyn's independent/assisted living arrangement, rather than the value of any household services as defined in the charge, provided the basis for the jury's award for loss of household services.
Dr. Grodzin testified that, due to her amnesia, it was unsafe for Carolyn to live at home without the domestic support and household services of her husband. He did not, however, identify what any of those services were. Rather, it appears he considered the mere fact that Detrick was no longer in the home. Similarly, he opined that Carolyn's need to be in an assisted living facility was directly related to Detrick's inability to "provide that support of service at home as he was previously." But he again failed to identify any service Detrick previously provided. In fact, Dr. Grodzin was not aware of the definition of *767 "loss of household services" provided to the jury.
Instead of being guided by the charge definition of "household services," Dr. Grodzin valued the loss of those services using the cost of Carolyn's current living arrangements. He began his analysis with $63,281, the charges incurred by Carolyn in the past to live at Independence Hill. He then deducted from that amount $1000 per month to account for savings related to Carolyn not living at home. He did not, however, know the basis for that $1000 figure.[4] Dr. Grodzin concluded that $44,281 ($63,281 minus $19,000) is a reasonable and fair amount for loss of household services in the past.
Again relying on the cost of living at Independence Hill, Dr. Grodzin opined that Carolyn will incur approximately $24,000 per year in the future. He did not testify concerning Carolyn's life expectancy and the jury was not provided with any other evidence to determine for how many years Carolyn is likely to incur these costs.
In his closing statement, Detrick's attorney urged the jury to award $44,000 in past loss of household services because that is the amount Carolyn has paid to live at Independence Hill (less the $1000 per month reduction noted above). Counsel urged an award of $150,000 for future loss of household services so that Carolyn can live in such a facility for the rest of her life. The jury awarded $45,000 for loss of household services in the past and $200,000 for loss of those services in the future, and judgment was entered for those amounts.
A jury is entitled to apply its own collective knowledge and experience to estimate the value of household services. Excel Corp. v. McDonald , 223 S.W.3d 506, 510 (Tex. App.-Amarillo 2006, pet. denied). Even so, its discretion is not unlimited; its valuation must be based on evidence. Id.
In this case, the jury could apply its knowledge and experience to determine a value for the household services Detrick no longer performs-yardwork and cooking. But no reasonable view of the evidence (or common knowledge and experience) supports a finding of $45,000 in the past and $200,000 in the future. See Excel Corp. , 223 S.W.3d at 510 (no reasonable view of evidence of son's services to mother supported an estimated value even approaching jury's award). Indeed, it does not appear that compensation for yardwork and cooking is even what the jury intended. Rather, the jury's award is clearly based on the cost for Carolyn to live at Independence Hill-a cost unrelated to the charge definition of "household services."
While there is some evidence of the past and future costs for Carolyn to live at Independence Hill, that evidence is irrelevant to determining the value of lost household services, as defined for the jury. The relevant inquiry must focus on the domestic duties Detrick no longer performs-yardwork and cooking. There is simply no evidence to support awards of $45,000 in the past and $200,000 in the future for loss of those household services. We therefore reverse the judgment of the trial court insofar as it awards damages to Carolyn for loss of household services.
Allocation of responsibility
In issue five, Regent Care challenges the jury's apportionment of responsibility.
The jury determined that Regent Care bore 55% of the responsibility for Detrick's injury. It allocated 18% to *768 Dr. Coutinho, 5% to Dr. Cubillos, 17% to Dr. Wagner, and 5% to MobilexUSA. Regent Care contends that this apportionment is not supported by legally or factually sufficient evidence. Its brief, however, does not contain any analysis of this issue, other than noting evidence of negligence attributable to the settling defendants. Regent Care has failed to establish any basis for this court to disturb the jury's allocation of responsibility.
The determination of negligent parties' proportionate responsibility is a matter soundly within the jury's discretion, and, after the jury's finding that [defendants] were all negligent and that their negligence proximately caused [plaintiff's] injuries, it is not the place of this Court to substitute its judgment for that of the jury, even if a different percentage of allocation could be supported by the evidence.
Hagins v. E-Z Mart Stores, Inc. , 128 S.W.3d 383, 392 (Tex. App.-Texarkana 2004, no pet.).
Regent Care has not demonstrated that the jury abused its discretion. Nor has it demonstrated that the jury's allocation of responsibility is not supported by legally or factually sufficient evidence. Its challenge to the jury's allocation of responsibility is overruled.
Application of the settlement credit and the statutory cap on noneconomic damages
Regent Care's sixth issue concerns the construction and application of two sections of the Civil Practice and Remedies Code-section 33.012, which governs the application of settlement credits, and section 74.301, which imposes a cap on noneconomic damages in health care liability cases.
Statutory construction presents a question of law and is, therefore, reviewed de novo. State v. Shumake , 199 S.W.3d 279, 284 (Tex. 2006). Similarly, a trial court's application of a settlement credit is reviewed de novo. Galle, Inc. v. Pool , 262 S.W.3d 564, 570 n.3 (Tex. App.-Austin 2008, pet. denied).
Section 33.012, as applicable to this case, provides as follows:
[I]f the claimant in a health care liability claim filed under Chapter 74 has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by an amount equal to ... the sum of the dollar amounts of all settlements[.]
TEX. CIV. PRAC. & REM. CODE ANN. § 33.012(c).
Section 74.301 provides, in cases where final judgment is rendered on a health care liability claim against a single health care institution, "civil liability for noneconomic damages ... shall be limited to an amount not to exceed $250,000 for each claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(b).
The jury found that Detrick suffered economic damages in the amount of $3,635,000 and noneconomic damages in the amount of $10,250,000.[5] Prejudgment interest totaled $51,375. Detrick settled with four defendants prior to trial for amounts totaling $1,850,000. Regent Care elected to have the court apply a dollar-for-dollar settlement credit rather than a credit determined by the parties' percentages of responsibility. See TEX. CIV. PRAC. & REM. CODE ANN. § 33.012(c), (d).
*769 The parties agree that a settlement credit is allocated first to prejudgment interest. See Battaglia v. Alexander , 177 S.W.3d 893, 908 (Tex. 2005). They disagree on whether the trial court was then required to apply the statutory cap on noneconomic damages before applying the dollar-for-dollar settlement credit. Regent Care contends that it was; Detrick contends that it was not. The trial court agreed with Detrick and applied the settlement credit first, then the statutory damage cap.
The crux of Regent Care's argument lies in its emphasis on statutory language that the settlement credit reduces "the amount of damages to be recovered by the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 33.012(c) (emphasis added). Regent Care urges that Detrick cannot recover in excess of $250,000 for noneconomic damages because of the separate statutory cap. Therefore, the cap must be applied first to determine "the amount of damages to be recovered by the claimant," and the settlement credit then applied to that reduced amount.
The crux of Detrick's argument is that the cap on noneconomic damages is not a limit on a claimant's damages , but a limit on a health care institution's liability -"the limit of civil liability for noneconomic damages ... shall be limited to an amount not to exceed $250,000...." TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(b). Therefore, the amount of damages is determined according to the jury's verdict and then reduced by any settlement credits. Only then is the statutory cap applied to conform with the defendant's limitation on liability.
Regent Care relies on the supreme court's statement in Stewart Title Guaranty Co. v. Sterling , 822 S.W.2d 1 (Tex. 1991), that "[m]erely because actual damages are established by the jury does not necessarily mean that the plaintiff may recover them" as support for its assertion that the jury's award must be reduced to the statutory cap before the settlement credit can be applied. Id. at 9. Stewart Title is of limited assistance.
The issue in Stewart Title was whether a settlement credit should be applied before or after applying an Insurance Code provision for trebling damages. Id. The supreme court noted that the one satisfaction rule presents two questions: (1) whether there are any actual damages; and (2) whether those actual damages are recoverable. Id. It is in this context that the court stated that actual damages are not necessarily recoverable merely because they are established by the jury. Id. The court further noted that "[t]he Insurance Code provides for the trebling of actual damages, not for the trebling of recoverable damages." Id. It therefore concluded that the settlement credit must be applied after actual damages are trebled. Id.
Stewart Title supports Regent Care's emphasis on the distinction between damages found by the jury (actual damages) and recoverable damages. It is not dispositive, though, because it does not address the effect of a competing statutory limit on liability and, therefore, does not address Detrick's argument for a contrary holding. The supreme court's opinion in Edinburg Hospital Authority v. Trevino , 941 S.W.2d 76 (Tex. 1997), provides a closer analogy.
Trevino is a medical malpractice case involving the interplay between a settlement credit and a damages cap under the Texas Tort Claims Act ("Tort Claims Act"). Id. at 81. The supreme court acknowledged that the issue was not essential to its disposition of the case, but addressed it to provide guidance to the trial court upon retrial of the underlying lawsuit. The court's discussion is, therefore, judicial dictum, which is "at least persuasive *770 and should be followed unless found to be erroneous." Seger v. Yorkshire Ins. Co. , 503 S.W.3d 388, 399 (Tex. 2016) (quoting Palestine Contractors, Inc. v. Perkins , 386 S.W.2d 764, 773 (Tex. 1964) ).
The trial court in Trevino first offset the jury's verdict by the amount of a prior settlement. It then reduced the plaintiff's recovery pursuant to the Tort Claims Act liability cap and rendered judgment for that maximum amount. Trevino , 941 S.W.2d at 81. The defendant hospital argued that the court should have applied the limitation of liability and then offset that amount by the settlement. Id. The supreme court held that the correct procedure is to deduct the settlement first, then apply the statutory limit. Id. at 82.
The supreme court reasoned that the Tort Claims Act provides a waiver of sovereign immunity that is limited (1) by the types of claims that may be brought and (2) by a cap on damages. Id. at 81. The Act does not limit a plaintiff's total recovery for an injury. Id. Instead, it "delineates the extent of the government's waiver of immunity from liability for that injury." Id. (emphasis added). In other words, it does not limit what the plaintiff can recover, it limits what the government must pay. The court noted that verdicts are reduced by prior settlements because of the "one satisfaction" rule. Id. at 82. But settlement does not affect "the maximum amount to which the government has agreed to waive its immunity." Id. at 82. For this reason, the court concluded that a settlement offset should be applied before damages are reduced to the statutory maximum. Id.
The question here, then, is whether the statutory cap on noneconomic damages is a limitation on a plaintiff's recovery or a limitation on a defendant's liability. Section 74.301 states that, as applicable to a health care institution in a health care liability claim, "the limit of civil liability for noneconomic damages ... shall be limited to an amount not to exceed $250,000 for each claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(b) (emphasis added). The statutory cap is clearly defined in terms of limiting a defendant's liability rather than a plaintiff's recovery, thus supporting application of the supreme court's reasoning in Trevino . In fact, at least one court of appeals has applied Trevino to this very question.
The First Court of Appeals in Christus Health Gulf Coast v. Houston , No. 01-14-00399-CV, 2015 WL 9304373 (Tex. App.-Houston [1st Dist.] Dec. 22, 2015, no pet.) (mem. op.), addressed "whether a settlement must be offset before or after applying the damages cap on noneconomic damages." Id. at *7. The court applied Trevino and held that the settlement credit should be applied first. Id. at *8. It found, however, that the trial court erred by applying the entire settlement credit to noneconomic damages and reformed the judgment to apportion the settlement credit between economic and noneconomic damages. Id. This is the same procedure employed by the trial court in the present case.
Finally, relying on Battaglia , Regent Care complains that the trial court was required to apply the settlement credit first to past damages and then to future damages. See 177 S.W.3d at 898, 911. Battaglia concerns the calculation of prejudgment interest. Regent Care does not challenge the trial court's calculation of prejudgment interest, so the concerns raised in Battaglia are not present here. The trial court's failure to apply the settlement credit to past damages before applying any portion to future damages is of no consequence.
Periodic payment of future medical expenses
In its seventh and final issue on appeal, Regent Care challenges the trial *771 court's order that only a portion of Detrick's future medical expenses be paid in periodic payments.
Section 74.503 of the Civil Practice and Remedies Code directs that, at the request of a defendant health care provider, defendant physician, or claimant, "the court shall order that medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments rather than by a lump-sum payment." TEX. CIV. PRAC. & REM. CODE ANN. § 74.503(a) (emphasis added).
The clear language of the statute demonstrates that its application is mandatory. Compare TEX. CIV. PRAC. & REM. CODE ANN. § 74.503(a) (court "shall" order) with § 74.503(b) (court "may" order). Nevertheless, it is equally clear that the court may order only some of the awarded damages to be paid in periodic payments. See TEX. CIV. PRAC. & REM. CODE ANN. § 74.503(a) ("in whole or in part"). The determination of the amount to be paid periodically is within the trial court's discretion. Houston , 2015 WL 9304373, at *9.
Regent Care complains that the trial court abused its discretion by ordering that only $256,358 of Detrick's future medical costs be paid in periodic payments. It does not, however, offer any alternative sum that it believes would have been more appropriate. Instead, it argues that the trial court was required to order the entire amount of Detrick's future medical expenses to be paid periodically. This argument is contrary to the plain language of the statute. Regent Care has failed to demonstrate an abuse of discretion. See Houston , 2015 WL 9304373, at *9.
Conclusion
We reverse that portion of the trial court's Final Modified Judgment awarding damages to Carolyn Detrick for loss of household services and affirm the remainder of that judgment. This cause is remanded with instructions to the trial court to recalculate the damages to be recovered by Robert and Carolyn Detrick from Regent Care Center of San Antonio, L.P. by (1) removing $45,000 in past economic damages and $200,000 in future economic damages, and (2) employing the same calculation methodology to the reduced damage figures as it employed in the Final Modified Judgment.

Regent Care's position at trial was that Detrick was incontinent when he was admitted and that his chart reflects that existing incontinence. Only now, on appeal, does it argue that Detrick's chart actually shows new onset incontinence.

Carolyn's daughter testified that these instances of amnesia do not happen often and that Carolyn is otherwise very sharp and coherent.

Detrick's daughter identified the $1000 deduction as the costs of a yard man and housekeeper, car insurance, and utilities that Carolyn no longer incurs.

These amounts include damages awarded to Detrick's wife. See Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(2).