**Affirmed and Opinion filed February 16, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-21-00755-CV

### DONOVAN MITTELSTED, Appellant

### V.

### DENISE MCCLURE MERIWETHER AND DARLA MCCLURE SANDS, Appellees

**On Appeal from the County Court at Law No. 3 & Probate Court
Brazoria County, Texas
Trial Court Cause No. PR39333**

## O P I N I O N

Donovan Mittelsted appeals a judgment against him in a will contest. The testator, Jack McClure, left his estate to Donovan, who is Jack's half-brother. Shortly before his death, Jack (with Donovan's assistance) also changed the beneficiary designations of six financial accounts to Donovan. Jack's sisters, appellees Denise McClure Meriwether and Darla McClure Sands, challenged the validity of the will and the beneficiary designations. A jury found that: (1) Jack

lacked testamentary intent to sign the will; (2) Jack lacked contractual capacity to change the beneficiary designation forms; (3) Jack was unduly influenced by Donovan in signing the will and in making the beneficiary changes; (4) Jack executed the will due to a mistake of fact; (5) Donovan wrongfully converted the beneficiary designation forms; and (6) Donovan did not act in good faith and with just cause in defending the will. Donovan challenges the evidentiary sufficiency of those jury findings, as well as the trial court's admission of certain testimony over Donovan's objection.

We hold that the trial court did not abuse its discretion in its challenged evidentiary rulings and that the evidence is sufficient to support the jury's findings that Jack lacked testamentary and contractual capacity. As a result of our holdings, we need not address Donovan's remaining arguments in support of the will or the beneficiary designations or regarding the conversion finding. We also conclude that the evidence supports the jury's finding that Donovan did not act in good faith and with just cause in defending the will. We affirm the trial court's judgment.

## Background

Jack was unmarried and had no children. He had two sisters, Denise McClure Meriwether and Darla McClure Sands, and a half-brother, Donovan. Jack's father predeceased him but his mother, Helen Mittelsted, was still alive when Jack died.[1]

Jack developed diverticulitis in 2011 and required bowel surgery for a ruptured polyp. He required the use of a colostomy bag for nine months afterward.

Jack had a stroke in 2017 and was hospitalized for a few days before checking himself out of the hospital against medical advice.

---

[1] Because many witnesses share the same last name, we refer to the related parties and witnesses by their first name.

Jack lived alone in his house, but Donovan lived in a mobile home nearby on Jack's property.

Shortly before he died, Jack changed the pay-on-death beneficiary designations on the following six financial accounts at issue in today's appeal:

- On November 2, 2018

  - Texas First Bank certificate of deposit ("CD"), account ending in -1390: Jack designated Donovan as the beneficiary. Prior to the change, Darla was the beneficiary.

  - Amegy Bank of Texas savings account, account ending in -9320: Jack designated Donovan as the beneficiary. Prior to the change, Denise was the beneficiary.

  - Amegy Bank of Texas CD, account ending in -2333: Jack designated Donovan as the beneficiary. Prior to the change, Denise was the beneficiary.

- On February 1, 2019

  - TD Ameritrade Roth IRA, account ending in -4082: Jack added Donovan as the beneficiary. Prior to the designation, there was no beneficiary on the account.

- On February 8, 2019

  - Amegy Bank of Texas CD, account ending in -0093: Jack designated Donovan as beneficiary. Prior to the designation, there was no beneficiary.

o BBVA Compass checking account, account ending in -6783: Jack designated Donovan as the beneficiary. Prior to the designation, there was no beneficiary.

On January 19, 2019, Jack met with an attorney, Matthew Hoffman, regarding the preparation of Jack's will and related estate planning documents. Jack executed a will on February 12, 2019, along with a durable power of attorney, a medical power of attorney, and a physician's directive. Barbara Morrison and Lisa Ann Robbel, neither of whom knew Jack, witnessed the will signing.

In the "identification of the family" section of the will, Jack named only Donovan. Jack devised his residuary estate to Donovan. A memorandum to the will provided:

Please give my following possessions to the person indicated:

- My Oldsmobile Cutlass (1972) – Cousin, Mike McClure

- My 2000 GMC Z-71 Truck – Brother, Donovan Mittelsted

- House and Land (42.36 acres) – Donovan Mittelsted

- Shop and Land (1/2 acre) – Donovan Mittelsted

  o Land/building/equipment, tools, other contents

  o League City, TX

The memorandum also provided that one $74,000 CD was devised to Donovan's daughter, Caley. Thirteen financial accounts (including the six mentioned above), totaling approximately $1.2 million, were devised to Donovan.

Donovan was named independent executor of Jack's estate and was designated Jack's agent in the primary medical and durable powers of attorney. Darla and Denise were backup executors, in the event Donovan could not serve.

4

Darla was the first alternate agent for Jack's medical power of attorney, and the only alternate agent for the durable power of attorney. Denise was the second alternate agent for Jack's medical power of attorney.

Jack died on February 22, 2019, when he was sixty-three years old.

The trial court admitted Jack's will to probate on Donovan's application. A month later, Darla and Denise filed a contest, alleging lack of testamentary capacity and undue influence. In an amended contest, Darla and Denise ("Contestants") further alleged mistake of fact. Contestants also challenged the validity of the beneficiary designations executed on November 2, 2018, February 1, 2019, and February 8, 2019, and alleged that Donovan converted several of those accounts. Contestants sought a declaratory judgment that Jack did not have contractual capacity to change the designations and that Donovan converted the assets.

The case proceeded to a jury trial, where the following evidence was presented.

## A. Contestants' witnesses

*Larry Click.* Larry had known Jack since the 1970s, and they were close friends. Jack was very successful. Jack's family was important to him. Larry testified that, many years before his death, Jack told him "that [Jack] had monies set aside for his family." Although Jack was "close" to Donovan, Jack never indicated that he was "fonder" of Donovan than he was of the rest of his family.

After the bowel surgery in 2011, Jack lost some of his "drive," and he was in a "weakened state." He was not "upbeat like he had been before." After Jack's stroke in 2017, he had a clubfoot and could not get around as easily as he could before.

5

Larry would visit Jack to watch movies "almost weekly," and Jack would be drunk by noon. "[S]everal years" before Jack's death, he was "getting so drunk he couldn't hardly get out of the chair, he was having a difficult time getting up." Larry testified that "[i]n the last three years when he was drinking, yes, he was always in an unbalanced state." Jack also smoked marijuana for as long as Larry knew him. Larry admitted, however, that Jack kept a clean house and there was no "booze" visible to visitors.

Jack was "always at the house" and rarely left. Larry mentioned to Donovan "about Jack being reclusive into the bed," and Donovan responded "something to the fact that the bed was like his casket. [Jack] was just going in [to his bed], and [Donovan] referred to it as [Jack's] casket."

Larry never saw Jack write a check or make himself a meal in the last two years of his life, but Larry was not aware of the full extent of Jack's dependency on others.

Larry spoke with Jack "right around" the day he died, and Jack never mentioned that he had signed a will. Jack never told Larry that he had changed his mind about his love for his family or that he had decided to leave everything to Donovan.

Larry regularly visited Jack's house, where the two would play pool. Jack's cousin, Mike McClure, often joined those pool games. Larry and Mike visited Jack's house the day before he died. Larry thought Jack stayed in his room that day and did not play pool with Larry and Mike. When asked whether he was aware that Jack drove to his shop or met with a real estate broker broker that day, Larry denied awareness of Jack being gone from the house. Larry did not think that Jack could have driven himself to sign documents on the day before his death: "I don't think he could have gotten up and drove because he would always

6

complain about being dizzy headed and he couldn't stand very long because he was dizzy headed and I just don't know if that was possible."

Larry visited Jack the day he died and described Jack's condition as "weak and exhausted."

After Jack's death, Larry told Donovan that Jack never intended for one person to "get everything." Larry "kind of insinuated that Jack wasn't in the condition to authorize a new will; and Donovan told [him] to get off the property."

Larry believed that Jack "knew who his family was."

***Dr. Sanjay Adhia.*** Contestants presented Dr. Adhia as an expert witness to opine on Jack's capacity and susceptibility to influence based on reasonable medical certainty. Dr. Adhia is board certified in psychiatry, forensic psychiatry, and brain injury medicine. Dr. Adhia never met or treated Jack, but he interviewed several individuals, reviewed affidavits, and considered medical and other records.

In 2017, Jack had a stroke. He was treated at a hospital but, declining further treatment, checked out of the hospital against medical advice. Dr. Adhia believed this showed Jack's "poor judgment." He also believed Jack chose to leave the hospital because he likely experienced withdrawal symptoms due to his alcohol dependency. Dr. Adhia explained, "So, if someone is used to drinking alcohol, there's two options as to either leave or a doctor could maybe detox them. . . . So, someone is very inclined to leave and get alcohol to treat those withdrawals because it is very uncomfortable." Dr. Adhia testified that a stroke can cause vascular dementia. Dr. Adhia believed Jack had more than one stroke, based on information given to him by Jack's family, but Jack's medical records only indicated treatment for the stroke in 2017.

7

In 2018, Jack suffered from lower back pain, hip pain, and an awkward gait. Jack was taking anxiety medication but, when it ran low, would drink more alcohol. He had fallen recently and was sedentary and disabled. He had hypertensive heart disease with heart failure, panic disorder, panic attacks, and depression. Dr. Adhia did not believe any of Jack's conditions had been treated or cured by the time of his death. Dr. Adhia acknowledged that, in July 2018, Jack's medical records indicated that his physician believed Jack was alert and oriented and his cerebral function was normal.

In Dr. Adhia's view, Jack's case presented "a perfect storm." Strokes often cause brain injury and render a person more susceptible to the effects of alcohol and marijuana. Jack was also taking Tylenol 3, which Dr. Adhia said contains Benadryl and "has recently been found to cause dementia and also cognitive impairment." Dr. Adhia personally would not have prescribed Jack Xanax, an anti-anxiety medication, because of Jack's history of alcohol use. Dr. Adhia believed that Jack did not regularly take his medications or have them refilled. All of Jack's medical and psychiatric conditions, Dr. Adhia continued, are "the perfect storm" and "could impair his cognition and his ability to perform activities of daily living, which are the more basic ones." Dr. Adhia testified that Jack also had difficulty with "instrumental activities," which is something "maybe a teenager could do," like balance a checkbook or communicate effectively. Dr. Adhia was concerned that Jack "required assistance to communicate with Matthew Hoffman, his attorney; and that's what Donovan did." Jack also required assistance purchasing alcohol.

Dr. Adhia testified that, if he had a patient "such as Jack," he would advise that patient to "not make major life decisions until he got his medical care . . . [and] to undergo substance abuse, disorder treatment, [and] addiction counselors."

8

Jack's cause of death was hypertensive arteriosclerotic cardiovascular disease. Dr. Adhia testified that Jack did not die "of just a heart attack," but a contributing factor noted on Jack's autopsy was chronic ethanolism, which is "pathology speak for alcoholism." In terms of usage, "that would mean regularly drinking large amounts of alcohol." Even in cases where someone drinks a lot of alcohol, the person can "hide the fact that he drinks alcohol."

Dr. Adhia believed that Jack was dependent on others for his care and basic needs. He was very susceptible to someone "steer[ing] him in any direction they wanted" and was "very pliable and easy to influence." Dr. Adhia agreed that "a person with the perfect storm" he described would "in part be motivated by the intentions of the person that he was dependent upon" when making the decisions at the end of his life.

*Mike McClure.* Mike was Jack's cousin and considered Jack his best friend. In the 1980s, Jack was very strong, very motivated. Jack was not a "drunk" in the 1980s, 1990s, or early part of 2000s. Jack was "tight" with his money. Jack told Mike that he was going to "give a little bit to each of his family members," and Mike was never aware of a time when Jack's intention changed. Jack indicated that he had a CD for Darla, two CDs for Denise, one CD for Caley, and one for Natalie (Darla's daughter and Jack's niece). Mike was unsure if Jack also had one for Donovan.

For years, Mike had seen at Jack's house a "cardboard will," which was nothing more than Jack's handwritten instructions on a piece of cardboard that everything he had was to go to his family. Mike told Jack that he needed a real will.

Mike put Jack in touch with Matthew Hoffman, who was married to Mike's sister. Mike got a will questionnaire from Hoffman and a "will had been drafted

9

for Jack." In December 2018, Mike saw a "draft will," which listed Jack's banks and had a list of the CDs and their beneficiaries. Mike variously described the draft will document he saw in December 2018. At one point in his testimony, Mike said that the document did not specify how Jack's estate was to be divided but rather was more like an accounting or inventory of Jack's assets. Mike later said that it was a "draft of a will in December of 2018," drafted by Hoffman.

In January 2019, Hoffman came to Jack's house for a meeting. Mike also attended and, at some point, Donovan showed up. Mike said the others "excused" him. In Mike's words, "[Donovan] was present. He stayed. I had to get out." Mike was not invited to any subsequent meetings. After the meeting with Hoffman, Mike never saw the cardboard will again, and he did not know what happened to it.

Mike testified that at one point he had a copy of the December 2018 draft will, which was "about 4 pages stapled together." But in January 2019, Mike gave the copy to Hoffman at his request. According to Mike, the December 2018 draft will aligned with the cardboard will, in that it said "everything to [Jack's] siblings."

Mike believed Jack began to decline mentally around 2018 or 2019. Jack was not active, was not eating properly, and began drinking a lot. Jack "wasn't driving anymore," and when Mike drove him to the store he would buy "like four bottles of vodka and some bottles of orange juice." Jack would have three or four glasses of vodka and orange juice in a day, at least in Mike's presence. After Jack's stroke, he began having dizzy spells. Jack tried to continue playing pool with Mike and Larry but eventually stopped and would stay in bed when they visited. Toward the end of his life, Jack did not seem to be showering "for long

periods of time." Mike visited Jack twice a week and saw "brutal bruises where he had fallen and hit the table and [probably] cracked his ribs."

Mike shared his concerns about Jack's drinking with Hoffman. In January 2019, Mike texted Hoffman that he was concerned about Jack because Jack "was slowly slipping away."

Toward the end of Jack's life, Mike assisted Jack with writing checks to pay some bills; Mike would write the checks and Jack would sign them. Jack could not write and could not fill out the checks himself.

Jack never indicated to Mike that it was his intention to leave everything to Donovan. Mike visited Jack's house once after his death. Donovan had moved in, had a new truck, had totally remodeled Jack's bedroom, and "had some real fancy paintings, pictures that probably cost $5,000, looked like he spent quite a bit of money." Prior to Jack's death, Donovan lived in a trailer bought by Jack, which was "run-down and it was on its last leg."

Mike said Jack told him he was going to leave Mike a 1972 Oldsmobile Cutlass in his will. Mike received the car from Jack's estate, sold it with Hoffman's assistance, and received the proceeds from the sale.

***Cammy Mason-Garrison.*** Jack was Cammy's oldest cousin. She said Jack was very successful and believed in saving money and taking care of family. He had CDs for everybody because he was proud of taking care of his family. Cammy last saw Jack in 2013 but since that time stayed in contact with him over the phone. Jack seemed fine "until about the last year or so." During their calls, Jack would "loop" or repeat conversations from the beginning "as if [they] had just picked up the phone." Cammy agreed that Donovan never interfered with Jack's ability to communicate with anyone.

11

***Matthew Hoffman, by deposition.*** Hoffman testified that he was not a probate lawyer, but rather a business bankruptcy lawyer who "occasionally does simple wills."

In the "seven or eight times" Hoffman saw Jack, Jack never drank. As far as Hoffman knew, Jack was a teetotaler. Hoffman did not recall that Jack's drinking or marijuana use ever came up. Hoffman later testified that he had met Jack only "three times" before he died.

Hoffman was not aware that Jack had a stroke, but he knew that Jack had abdominal surgery. When Hoffman saw Jack in 2019, "he was greatly improved and had been doing a whole lot better."

Hoffman testified that Donovan "just showed up . . . maybe 30 to 60 minutes into" the January 19, 2019 meeting at Jack's house. Hoffman did not take any notes during the meeting but instead filled out a blank template. During the meeting, Jack described his assets, including the house, shop, business, bank accounts, and CDs. Jack also had cars, trucks, and motorcycles. Hoffman asked for a "memorandum that was accurate" reflecting "Jack's desire to have the things that were in the memorandum go [to beneficiaries] pursuant to the memorandum." According to Hoffman, "Donovan said, I can prepare such a list." In Hoffman's words, "I was just getting started in the process. I took some rough notes. Once Donovan got there and he explained that he was going to give me a detailed listing, I just kind of relaxed and waited to get the listing."

According to Hoffman, "Jack told [Hoffman] he wanted the will to provide -- he told [Hoffman] what he wanted the will to provide, about all of these things. . . . [Jack] wanted Donovan to be the executor and the beneficiary." Jack also wanted Mike to get the Oldsmobile and Caley to be the beneficiary of a CD. Jack did not tell Hoffman that he had more than one niece. Hoffman and Jack did

12

not discuss "why he wanted his half brother to be the primary beneficiary as opposed to his sisters and brother."

A week after the meeting, Hoffman got an email from Donovan with a memorandum of "all the assets that were in the various banks." Donovan either prepared the memorandum itself or drafted its contents. Hoffman did not recall if he ever had a private telephone call with Jack.

Hoffman "probably set up" an additional meeting with Donovan and Jack on February 2, 2019. Hoffman brought a draft of the will and discussed it with Jack and Donovan. "Donovan was there presenting it to Jack." The agreed intention was that Jack and Donovan would visit the different banks where Jack had accounts or CDs "to be sure that they were all in either Donovan's name or the 74,000 amount in Caley Mittelsted's name as the contract beneficiary because [Hoffman] had told them that they would not be passing under the will."

When the will was executed, "there was a time" when Hoffman and Jack were alone "talking about the will and ramifications and what it meant." Hoffman said he had a discussion with Jack, alone, when Hoffman asked Jack "only one question": "I said, Jack, are you sure this is what you want to do, and he looked at me and he got right in my face and he said, Yes, because I know that Donovan will do the right thing." Hoffman did not ask for any further clarification from Jack. Hoffman speculated that Jack meant that Donovan would take care of Helen and, if other family members "got in trouble or sick or in need," then Donovan would "also include that." Donovan was in the room "[a]t some point" but not when Hoffman was speaking to Jack privately. The witnesses were two employees of businesses that officed in the same building as Hoffman. They would have met Jack for "15, maybe 20, maybe 12" minutes.

13

Hoffman did not know of a cardboard will or 2018 draft will that left Jack's estate to his family. Hoffman and Jack never discussed disinheriting Darla, Denise, or Helen.

Hoffman agreed that he communicated with Donovan about setting up meetings, reviewing documents, and verifying information about Jack's assets.

*James Meriwether.* James is Denise's husband. James began to see a decline in Jack after the diverticulitis in 2011. In 2018, Jack "appeared to be deteriorating further. He looked like he had lost some more weight." Jack appeared frail. In 2018 and 2019, James never saw Jack write a check and was not aware if Jack visited a doctor. The last time James saw Jack driving a car was Thanksgiving 2017. James and Denise would bring Jack food because Jack was not able to "go out and shop for himself." James described Jack as "childlike" and "depressed," but he admitted that no one ever expressed a concern about the numerous firearms Jack had in his house.[2]

James and Denise purchased a new mattress for Jack in 2018. When it was delivered, James saw that the old mattress was stained with blood and "other stains that would be consistent with incontinence." In Jack's bedroom, there were pillows and cushions on the floor "to cushion Jack in case he had a fall." James did not personally see Jack fall but "there were indications that he had fallen before," such as bruises.

James and Denise visited Jack on Christmas Eve 2018, which was the last time James saw Jack. James saw a draft of a will at that time. James did not read the will because a will is "a very private thing," but he saw that the last paragraph on the first page had the names Donovan Mittelsted, Caley Mittelsted, and Denise

---

[2] After his death, thirty-eight guns were inventoried at Jack's house.

14

Meriwether.  James did not have concerns regarding Jack's mental state on that day.

James was not aware of any reason why Jack would not leave anything to his sisters or mother.

***Denise Meriwether.***   After Jack's stroke, his hand and arm on his left, dominant side were "messed up."  Jack had a cane and needed to use it, but he did not always use it.  Jack fell regularly, which is why he wanted pillows and blankets on the floor by his bed.  In 2018 at least, Jack had hallucinations and nightmares of going to hell.

Jack discussed with Denise that "he was going to leave his bank accounts to various family members."  The last time they spoke about it was November 19, 2018.  Jack said "we would be better off when he was gone.  He was taking care of all of us, that he had a CD for Darla, Natalie, Mom, Caley."  Jack also told Denise, "Don't tell anybody, but I got two in your name," as well as a "small savings account."  Two weeks earlier, however, Jack changed the beneficiary forms on the Amegy CD and Amegy savings account from Denise to Donovan.  Jack did not mention the changes to Denise, and she believed that he did not remember going to the bank and making the changes:  "I guess he didn't remember that he had done it. He certainly couldn't have done it by himself."

In October and November 2018, Jack deteriorated pretty quickly.  "He was -- he was going downhill quite fast, and he was drinking a lot."

In 2018, when Jack appeared childlike, Denise would not have felt comfortable taking a check from him, asking him to sign a legal document of any kind, or taking him to the bank and having him change account beneficiaries.  In 2018 and 2019, Denise felt like Jack had "passed the point of handling his own

affairs." Denise knew that Jack needed help with tasks like writing checks and that Mike was helping Jack "get a will done" in October or November 2018. She did not talk about the specifics with Jack. Denise did not know whether Jack had legal capacity to sign a will, but she had concerns. At that point, Jack "couldn't do anything for himself, really. He didn't even cook food." Like James, Denise saw a draft will in December 2018 but did not read it.

Jack never mentioned leaving all of his assets to one person or favoring Donovan and Caley over anybody else in the family. Denise recalled first seeing the cardboard will in 2008 but did not remember when it disappeared.

In August, October, and November 2018, Denise and Mike were the ones "mostly helping Jack." By January 2019, Donovan's ex-wife, Susan, was shopping, cleaning, and prepping meals for Jack. It was out of character for Donovan to help out with Jack. "It just wasn't in [Donovan's] nature to be helpful." It was not until the last few months of Jack's life that "Donovan got involved doing anything." Jack was not allowed to visit Donovan in his trailer, which hurt Jack's feelings.

Denise saw Jack and Donovan on February 2, 2019, when they "had just come from some banks." Donovan was "kind of excited," while Jack "didn't say anything. He just looked worn out, sweaty, red." Donovan was "[e]xcited, jovial, . . . upbeat."

Denise did not believe that the executed will or the beneficiary changes reflected Jack's interests and desires. Denise believed that Donovan "took over [Jack's] life and made him do that." She believed that controlling Jack's life was Donovan's "sole intent for helping Jack out," because Donovan had never helped before.

Jack "absolutely lacked the capacity" to execute a will in February 2019. "[H]e didn't have the ability the last six to eight months of his life to be making decisions." Her married name, Meriwether, was misspelled as "Meriweather" on Jack's will and as "Merriweather" on Jack's medical power of attorney, and Jack had never misspelled her name before. Denise was "confident Jack would never have" made a will "without a backup beneficiary [in the event Donovan predeceased Jack] had he been of sound mind. If he had any mental acuity, he would have known there needed to be a backup."

***Donovan Mittelsted.*** According to Donovan, Mike and Larry lied when they said that they did not regularly see Donovan at Jack's house. Donovan and Jack were "extremely close." Donovan denied that Jack was ever "dependent" on him, except to drive him places. Donovan agreed that he drove Jack to the banks and Hoffman's office but did not recall driving him anywhere else.

Jack did not have internet or e-mail at home, but he did have a cell phone during the last two years of his life. If Jack needed Donovan's help, he would raise the blinds in his house as a form of communication, and Donovan would know to go check on Jack. Donovan agreed that he was not at Jack's every day.

Donovan recalled a time when he found Jack on the floor of his house, "thought he was drunk, and put him to bed." Three days later, Jack developed a slight facial droop. Donovan took Jack to the emergency room, where they learned that Jack had a stroke. When Jack checked himself out of the hospital against medical advice, Donovan drove him home.

Donovan denied telling family members in 2018 that he had stopped spending time with Jack because Jack was depressing, but he admitted telling Darla that it was depressing to see Jack "physically not the man [he] once was."

17

Donovan did not recall ever saying that Jack "wasn't much of a drinker." Donovan disagreed with Mike's testimony that Donovan drove Jack to get alcohol. Donovan never mentioned the stroke or the drinking to Hoffman.

Donovan visited Jack's house on January 19, 2019 but was not aware of the prearranged meeting with Hoffman. Donovan caught up with what had been discussed and stayed for the rest of the meeting. Donovan "became aware" of Jack's finances on January 19, 2019.

Donovan did not recall any other meeting until the will execution, even though text messages with Hoffman indicated that another meeting occurred. Donovan prepared the memorandum to Jack's will. Donovan denied that he agreed with Hoffman that if Hoffman did the will for free then Donovan would hire him to probate it; according to Donovan, that arrangement or agreement was between Jack and Hoffman.

Donovan believed that there were never prior beneficiaries on the accounts that Jack changed. Donovan later testified that he knew that Caley was a beneficiary on one CD, but he was not aware of any other beneficiary designations. Donovan and Jack visited five financial institutions on February 1. Upon leaving each institution on February 1, Donovan was aware that he was the sole beneficiary on the relevant accounts. Donovan agreed that he and Jack did not visit the bank holding Caley's CD. Donovan denied seeing Denise at Helen's house on February 1. He did not deny being at Helen's house, but he did not recall going there and did not recall mentioning anything about the banks or accounts to Helen or Denise.

Donovan did not recall having any phone conversations with Hoffman, contrary to what Hoffman testified. Jack was mentally capable of speaking with Hoffman on the phone, but not of driving himself to Hoffman's office.

18

Hoffman did not read the will to Jack. Jack did not ask any questions prior to signing. Donovan was present while Jack signed the will and the powers of attorney. Donovan agreed that it was "not true" that his only participation in the "drafting of the will" was being a chauffeur. Donovan called Darla to get her address on the day of the will signing. According to Donovan, he told Darla what he and Jack were doing that day. Donovan did not tell Darla that he was the sole beneficiary on all Jack's accounts.

According to Donovan, Susan was the last person to see Jack, the night before he died. Susan told Donovan that Jack refused to eat or take his medications but was "alert and verbal." Donovan was the one who found Jack dead and called the police. In the police report from the day of Jack's death, Donovan told responding officers that "Jack Allen McClure self-medicated with alcohol and marijuana." Donovan confirmed that Jack was "a heavy drinker."

Donovan never heard Jack say that he was proud that he had set aside money for his family. Donovan never saw the cardboard will or the 2018 draft will. The rest of the family fabricated the entire story about Jack being proud of the money he was leaving to his family. Donovan was not aware of any falling out between Jack and his sisters and mother. Prior to trial, Donovan signed an interrogatory stating, "Perhaps it was Jack's concern that if an inheritance were left to his mother, his sisters would continue their manipulations and greediness." At trial, Donovan did not recall making that statement.

Jack allegedly told Donovan that there were "caveats" to Jack leaving his estate to Donovan: Jack wanted Donovan to live in his home, take care of his home and not sell it, pay for Caley's college, and "take care of [Helen]."

Donovan believed the original of Jack's will was kept in Jack's safe, but that it was "possible" that Donovan took the document to Hoffman's office after Jack's

19

death.  Donovan withdrew $112,000 from the Amegy CD, account ending in -1390, after Jack's death.  Donovan closed an account on which Helen was the previous beneficiary.  When asked if he was going to put the money back "for her," he said, "No, there was no plan for that."  Donovan acknowledged that, if the changes had not been made, Helen would have received the "lion's share" of Jack's estate; he also agreed that he had not provided care or money for Helen since December 2018 other than paying her phone bill.

Donovan wrote an email to Darla and Denise in April 2019, saying, "Seeing how this has all blown up, I wish Jack would have been able to tell his entire family his final plans and final reasons before he passed.  I had no idea that this is what was coming."  Donovan said that his email meant that he did not know the litigation was coming, not that he did not know that Jack had made him sole beneficiary.

***Darla McClure Sands.***  After 2011 and 2012, Jack fell into depression, drinking, and panic attacks.  Every time Darla saw Jack in 2017, 2018, or 2019, he was intoxicated.  Jack was capable of short sentences and could tell people he was "fine."  When Jack was drinking, his speech was slurred and slowed.

At the behest of family members who could not reach Jack, Donovan went to Jack's house in 2017 and found him unconscious.  Donovan said he was "just intoxicated" and put him in bed.  Later, Jack went to the hospital and discovered he had a stroke.

Jack could not go to the grocery store by himself, so Darla ordered him groceries.  Donovan would pick up the groceries and take them to Jack, but Donovan seemed "put out" by it; he said "Jack had everything he needed and that [Jack] was just looking for attention."  Darla got the impression that Donovan was

20

often irritated with Jack because Donovan would want to leave events early to take Jack home and would say that he was tired of bringing Jack places.

Darla saw the cardboard will, which Jack had "for years." Jack worried about Helen, who was legally blind, and about not being able do anything for her. Jack would not have knowingly removed Helen as a beneficiary from his accounts. When Darla was helping Helen draft power of attorney forms prior to Jack's death, Helen wanted Donovan, Darla, and Denise to be "equal." She did not want Jack to be named as her agent "because of his incapacitated state. He couldn't take care of his own affairs, much less hers." Donovan was a joint owner with rights of survivorship on some of Helen's accounts and had been designated as such for a long time.

Denise called Darla after seeing Jack and Donovan on February 1, but Darla did not call either Donovan or Jack to talk to them about anything.

Darla knew that Donovan was taking Jack to the banks in 2019 but she did not ask why. Darla knew that Jack was signing legal documents on February 12, but she did not believe that Jack should have been executing any document, regardless of who benefited. Donovan told Darla on February 12, "we got all of Jack's legal stuff completed today with the help of Matt Hoffman." Darla admitted that she told Donovan "great job" on "getting Jack's legal docs completed." However, she testified that she "disagreed" with Jack "getting his estate documents done." Around the time when Denise and James saw the draft will in December 2018, Darla told Helen and Ron that Jack "was not of sound mind to do a will. He should not be signing anything." Darla testified that Jack "was not of sound mind to do what he did. Sign financial documents, change the banking institution." She held that opinion on February 12 but did not express it because the "subject was never broached." If anyone had asked her, she would have told them. Although

21

Darla testified that she believed Jack should not have been signing documents, she agreed that she never "verbalized" that belief to anyone.

In 2019, Jack was not able to go to the bank on his own. Darla would be surprised if Jack was able to walk in on his own without holding onto someone's arm.

Darla saw Jack on February 20, 2019, two days before he died. Jack was exhausted and looked pale and frail. According to Darla, "He had no affect on his face. It was -- it was just flat and to try to have a conversation with him, again, he was just very quiet. You could ask him questions and he would answer you, but he was not engaging."

Darla did not know prior to Jack's death that she was designated a backup agent in the power of attorney, and Donovan never sent her the documents.

Darla believed that Jack was dependent on Donovan between November 2018 and February 2019; that Jack placed trust and confidence in Donovan; that Jack relied on Donovan to do the right thing; and that Jack and Donovan had a special relationship of trust because of Jack's mental condition. Darla believed that, if Jack had been of sound mind, he would have known how to spell Meriwether. Darla believed that Donovan had control over Jack in the last three months of his life.

When Darla inquired about the will and CDs after Jack's death, Donovan responded, "Jack left everything to me except for Caley's CD." Darla still would have contested the will, even if it left everything to everyone, because she did not believe Jack was of sound mind to make a will.

***Natalie Hannum.*** Natalie is Darla's daughter. Jack had one stroke for which he sought medical care, but then in 2017 or 2018, Natalie said that "we

22

could see things that let us know that they [sic] were multiple strokes happening." Those events were not documented because Jack did not seek medical care for them. Jack suffered a "dramatic decline . . . . It was cognitive. . . . Mental . . . judgment, safety awareness, memory, everything." When Natalie spoke with Jack, "you could see that he was searching for words. He couldn't really string conversations together anymore. You'd throw something at him, but you didn't get anything back."

Natalie suggested physical therapies for Jack to try to help with his arm and his dizziness, but the next time she talked to him, "he wouldn't remember."

***Ron Sands.*** Ron is Darla's husband and a retired licensed mental health professional. Based on his observation and experience as a recovered alcoholic and addict, Ron believed that addiction and alcoholism can affect somebody's ability to reason. Ron treated "[t]housands" of alcoholics throughout his career. Ron explained that alcohol is a central nervous system depressant and affects the decision-making part of the brain. In Ron's opinion, all alcoholics become incapacitated.

Ron and Darla visited Jack once or twice a year. Ron could not remember a time when Jack was not under the influence. Jack's drinking "[a]bsolutely" increased later in his life. Jack had large quantities of alcohol in his home.

Comparing Jack from 1995 to Jack in 2018, Ron believed that Jack's alcoholism had an impact on his brain. Jack increasingly became "more depressed, despondent in nature, anxious, fearful, self-centered." Jack's self-care declined. He resisted seeking medical treatment, "even when he had medically sound reasons to go, such as fractured wrist, fractured ribs." Ron observed a mental decline in Jack. Jack became more childlike around 2017 or 2018. Jack became more dependent on family members to assist him with paying his bills, doing his

23

shopping, and getting him to and from various locations. Ron acknowledged that Jack knew and could identify his family members but there were also "cognitive problems."

If Jack handed Ron a check in 2017 or 2018, Ron would not have accepted it because he did not believe that Jack was capable of cognitively managing his own affairs. Ron would not trust that Jack would be "aware of the purpose and motivation behind why he was providing [Ron] a check." Even if Jack did not drink for several hours, Ron did not believe that Jack would have had the cognitive ability during "this sober moment" to make major financial decisions.

***Helen Mittelsted.*** Helen was Jack's mother. Jack was very successful. On more than one occasion over the years, Jack said that he was going to leave everything he had to his family. Jack said it "a whole lot of times." In his later life, Jack said that his family would be better off financially if he was dead.

From 2017 until his death, Jack could not take care of himself very well. Helen felt like Jack's life was drinking, smoking marijuana, and laying in bed. She believed that he no longer cared about anything. Jack "[p]retty much" stopped handling his own affairs.

## B. Donovan's witnesses

Contestants rested after Helen's testimony, and Donovan called the following witnesses.

***Tammy Planchon.*** Planchon is a branch service manager at Amegy Bank. Jack came in once or twice a month. Planchon remembered opening a CD for him for a pretty large amount. Jack was "very lively" and "knew what he was doing." Jack did not appear to be under the influence or intoxicated. Jack came in by himself and the next time came with Donovan. The bank had a policy to contact

the "back office" if an employee suspected "something going on, like if there's elderly abuse or something like that." Planchon never had any such concerns in her meetings with Jack. Planchon did not know any of Jack's personal business, such as his alcoholism. Planchon had "no knowledge of any of his personal life except for his financial life that he had with the Amegy Bank."

Planchon believed that Jack came in alone when he made the beneficiary change, although she also recalled an unspecified time when Donovan accompanied Jack.

*Jason Kieschnick.* Kieschnick is a commercial real estate broker. Donovan contacted Kieschnick in connection with listing Jack's shop for sale. Kieschnick was "sure" that Donovan was present at the initial meeting but could not recall if Jack was there too. Jack was definitely present at the second meeting on February 21, 2019, the day before Jack died. Jack mainly "just listen[ed] and nodd[ed] his head and [said] okay when we discussed what we were going to list the property at, that kind of thing." Jack did not give any details or answer any questions beyond seeming "pleased" with the proposed asking price. Kieschnick believed that Jack understood the nature of the conversation.

The contract to sell Jack's shop was executed the day before he died. Donovan finalized the deal a month or two later.

*Sam Soderman.* Soderman was the branch manager for TD Ameritrade in 2019. He met Jack in person once. It is "possible" that Soderman's office was where Jack made the February 1 beneficiary change. Soderman remembered Jack coming in with Donovan one day and assumed it was February 1. Although customers can update beneficiary information online, Jack and Donovan "insist[ed] on speaking to a manager."

*Lisa Robbel.*  Hoffman asked Robbel to witness Jack's will.  Robbel did not work for Hoffman but officed in the same suite, and she was available.  She participated in will signing ceremonies many times over the course of her career as a legal assistant and paralegal.  Robbel described the "normal will signing process," which involves the notary swearing the testator and the witnesses in prior to signing, the attorney going through the will and explaining everything, and the testator answering questions like, "Is this your last will and testament?  Do you intend this to be your last will and testament?  Have you read your last will and testament?  Do you agree with this?  Is anyone coercing you, or are you doing this of your own free will?  Have you asked these witnesses to witness your signature on your will?"

Robbel remembered Hoffman's assistant, who was the notary on Jack's will, swearing her in.  Hoffman went through "the whole will thing" with Jack and asked the questions that Robbel described above.  Jack responded appropriately in her opinion; "he seemed fine."  Robbel testified that Jack agreed, when asked, that he willingly made and executed the will.  Although Hoffman had testified that he did not call the witnesses into the room until after he finished his private conversation with Jack, Robbel recalled Hoffman asking Jack questions.  Robbel specifically "remember[ed] questions being asked."  She was "pretty sure [Hoffman] asked questions," not someone else, such as the notary.

In Robbel's experience, it was common for family members to attend a will signing.  Jack did not mention the strokes, panic disorder, alcoholism, heart disease, depression, or other family members in Robbel's presence.

*Susan Ramirez.*  Susan is Donovan's ex-wife.  Susan and Donovan married in 1996 and divorced in 2018.  They had one child together, Caley.  Susan, Donovan, and Caley moved into the trailer on Jack's property in 2006.

When Jack came home after surgery in 2011, he had a wound that needed routine care, and Susan helped with that.

Jack, Helen, Susan, Caley, and sometimes other family would have get-togethers at Jack's house every Saturday. During 2006 to 2010, Jack was an occasional drinker. Susan only ever saw Jack intoxicated one time, around 2010 or 2011.

In 2018, Darla called and asked if Susan could help Jack with housekeeping. Jack paid Susan $20/hour. Susan bought vodka for Jack a couple of times. Susan sometimes grocery shopped for him, although he was still driving at the time. Up until the end of his life, Jack would drive his trash to his mother's house for collection. Susan wrote checks for him to pay bills "maybe a couple of times." Jack could use his left hand, but it was difficult for him to use it for very long. Jack was good at overseeing his finances.

Susan called Jack the day before he died. He answered and they had a conversation, then she went to his house. He had been out of the house that day and drove himself, though Susan did not say where he had been.

***Barbara Morrison.*** Morrison was the second witness on Jack's will. Morrison did not work for Hoffman but worked in the same building. She witnessed wills three times a year.

Regarding Jack's will signing, Morrison testified, "We just signed the documents. We witnessed him signing and us signing." She did not recall any conversation with the notary or statements made by the notary, nor did she recall Hoffman making any statements. Morrison did not witness any communications between Jack and Hoffman.

***Courtney Politz Lullo.*** Lullo is the office manager for Hoffman's firm, and she was the notary on Jack's will.

Everyone was in the conference room when she arrived. Lullo did not recall whether Donovan was in the room during the will signing. Contrary to Robbel's testimony, Lullo did not recall placing anyone under oath. She did not swear the witnesses as to whether Jack was of sound mind. Lullo did not recall any conversation while she was in the room. Lullo did not go through the questions on the self-proving affidavit with Jack or the witnesses. Lullo did not recall if Hoffman asked any questions during the signing. February 12 was the first day she met Jack. He "seemed normal, [she] guess[ed]." He appeared to be doing everything voluntarily.

Lullo agreed that wills were not Hoffman's area of practice. Lullo agreed, as Hoffman testified in his deposition, that he destroyed drafts of wills as "soon as they're done with." So, if there had been an earlier will such as the one ostensibly seen in December 2018, the draft would no longer be in Hoffman's file.

***Matthew Hoffman, in person.*** The majority of Hoffman's practice was bankruptcy, not wills and estates.

Hoffman believed Jack had been "very ill" in 2018, "almost to the point of death." Around the beginning of 2019, Mike told Hoffman that he thought Jack needed to get his affairs in order. Mike set up the initial meeting, at Jack's house on January 12, where they very briefly talked about will planning. They met again on January 19, where Hoffman and Jack talked about Jack's estate plans "in general parameters" before Donovan arrived. Hoffman did not recall asking Mike to leave the meeting.

28

Jack told Hoffman what he wanted done and was straightforward about his desires. Hoffman asked him "how he wanted his property to go and to whom and who he wanted to be the executor and things like that." Jack told Hoffman that he wanted a do-not-resuscitate directive. Jack did not do or say anything that made Hoffman question whether Jack would be able to sign a will.

Hoffman's notes from the January 19 meeting indicated that "[a]ll CDs" were to go to Donovan. Jack did not give an explanation for what he wanted; he just told Hoffman "that's what he wanted." Jack talked about his bank accounts and mentioned some by name. But Hoffman was not sure if he learned everything from Jack or whether he learned some of the bank information from Donovan. Donovan did not instruct Hoffman that he was to be the beneficiary of the accounts. All of "that part of the communication" came from "Jack alone."

Hoffman agreed that, after January 19, all of his communication about Jack's estate was "through Donovan."

At the will signing, Jack appeared "calm and collected and happy, kind of content, relieved to be getting this done." He never appeared childlike to Hoffman. Hoffman took Jack "through the entire will . . . [and] the four related documents: the powers of attorney, the durable power of attorney, the physician's directive, and explained each one, line by line and made sure he understood each one." Then Hoffman told Lullo to go get the witnesses. When Hoffman and Jack were alone, Hoffman asked Jack "one question": "I asked him, Jack, are you sure this is what you want to do? . . . He turned to me and he looked at me and said, Yes, because I know that Donovan will do the right thing." Donovan was not present when Hoffman reviewed the will and documents with Jack. Donovan was in the lobby.

29

Hoffman did not believe that Donovan was influencing Jack. The final will at issue reflected Jack's wishes. If family members saw a draft will in 2018, that had nothing to do with Hoffman.

Hoffman did not know anything about Jack's alcoholism.

According to Hoffman, Donovan timely filed an inventory during probate and appropriately served as executor.

*Luz E Vela.* Vela is Susan's best friend. Vela never saw Jack drink or get drunk at family gatherings. The last time she saw Jack was Thanksgiving 2017 at Helen's house. Jack seemed fine, did not have lapses in memory, and was not acting childlike. The only complications she witnessed after Jack's stroke was mechanical issues with his left hand.

Vela disagreed with Helen's testimony that Jack never said anything about leaving everything to Donovan.

*Donovan Mittelsted.* Jack and Donovan "had a lot in common." The two spent a lot of time together when Donovan was in his teens. Jack provided financial assistance as Donovan was growing up, such as with buying his first car. They saw each other less frequently once Donovan married Susan and moved farther away.

The symptoms from Jack's stroke progressed slowly over time. No one ever expressed concern about Jack living by himself or about Jack having guns in his house. In the last sixteen months of his life, Jack did not need assistance showering. Jack could do everything, including basic hygiene, eating meals, or making phone calls, on his own. The last year of Jack's life, he was driving once or twice a week, for instance to take the trash to his mother's house.

Jack would call and leave voicemails for Donovan if he needed help with something or wanted Donovan to do something for him. Jack occasionally asked Donovan to write out checks for him in the last three or four months of his life. Jack never had trouble remembering family members.

Jack smoked marijuana less frequently as he got older. Donovan never saw his brother "stoned" and marijuana "had no effect to [Jack]." Jack did not become a "drinker" until after 2011. Jack did not always drink alcohol during Donovan's visits. Donovan never saw Jack drink in the morning. Donovan saw Jack "buzzed and feeling good" quite frequently but only saw Jack "drunk" a handful of times during the last year of his life. Donovan and Darla spoke once about staging an intervention with Jack regarding his drinking but decided against doing it.

According to Donovan, Jack "never mentioned" anything about taking care of his family, "except for Mom and Caley." Donovan never had a discussion with Jack on what to do with his estate. Donovan believed that Jack had "the most confidence" in Donovan of "anybody in the family." Donovan denied having a "special relationship" with Jack "[l]egally speaking." Donovan knew where Jack kept the code to his safe; Jack told Donovan where he kept it.

Donovan denied being with Jack on November 2, 2018, when Jack made changes to some beneficiary designations, but he agreed that he accompanied Jack on February 1 and February 8, 2019 to change additional beneficiary designations.

Jack was happy on the day of the will signing because this "was going to be one of the big things to do, checked off." Donovan drove Jack to Hoffman's office. Donovan never instructed Jack on how to leave his estate. Donovan never attempted to trick or influence Jack to change his mind about any of his estate plans. Donovan denied unduly influencing Jack. Donovan testified that it was "totally ridiculous" to suggest that Jack did not know who his family was or that he

31

was not aware of his property. Jack's "mental capacity was the same the day he died that it was 30 years ago."

Donovan's plans for Helen were unchanged by the lawsuit. He would "always provide for her." Donovan moved into Jack's house after his death. All the renovations Donovan made to Jack's house came from the funds at issue in the case, because Donovan did not have other income. Donovan also bought Caley a car with funds from Jack, but Donovan said it was an agreement between he and Jack.

*Caley Mittelsted.* Caley is Donovan's and Susan's daughter. In the last six months of Jack's life, Caley would go to Jack's house and watch movies with him in his bedroom. Caley did not experience Jack "looping" in conversations. Jack never had trouble recalling family members. Caley was unaware of any fights between Jack and other family members.

## C. Jury findings and judgment

After both sides rested, the jury found:

- Jack lacked testamentary capacity to sign the will.

- A relationship of trust and confidence existed between Jack and Donovan on November 2, 2018, February 1, 2019, February 8, 2019, and February 12, 2019.

- Jack signed the will as a result of undue influence by Donovan.

- Jack executed the will due to a mistake of fact from an alleged undue influence or fraud by Donovan.

- Jack lacked contractual capacity to change the beneficiary designation on the Texas First CD (-1390), the Amegy savings account (-9320),

32

the Amegy CD (-2333), the BBVA checking account (-6783), the TD Ameritrade account (-4082), and the Amegy CD (-0093).

- Jack signed each beneficiary designation form as a result of undue influence and/or as a result of mistake of fact.

- Donovan engaged in conversion concerning the beneficiary designation form for the Texas First CD (-1390), the Amegy savings account (-9320), and the Amegy CD (-2333).

- Donovan did not act in good faith and with just cause in defending the will.

- Darla and Denise acted in good faith and with just cause in prosecuting the will contest and were entitled to trial and appellate attorney's fees.

- Donovan was entitled to attorney's fees for the action to defend the beneficiary designation forms.

The trial court signed a judgment (1) incorporating the jury's findings, (2) vacating the will to probate, (3) vacating Donovan's appointment as executor, (4) declaring void the beneficiary designation forms, (5) ordering Donovan to turn over to Darla and Denise, respectively, $112,000, representing the amount in the Texas First CD (-1390), and $132,200, representing the amount in the Amegy savings account (-9320) and CD (-2333), and (6) ordering Donovan to turn over to the successor administrator of Jack's estate all assets in Donovan's possession belonging to the estate, including $535,201.63, representing the amount in the BBVA checking account (-6783), the TD Ameritrade account (-4082), and the Amegy CD (-0093). The judgment also enjoined Donovan from conveying or

expending any estate assets, except to convey them to the successor administrator or as ordered by the court.

Donovan appeals.

## Issues Presented

Donovan presents four issues for review. In his first two issues, he argues that the trial court abused its discretion by admitting Dr. Adhia's testimony and portions of Ron Sands's testimony. Third, he argues that the jury's findings regarding testamentary capacity, contractual capacity, undue influence, mistake of fact, and conversion are unsupported by, depending on the finding, legally or factually sufficient evidence. Fourth, he argues that the evidence is factually insufficient to support the jury's finding that Donovan did not act in good faith and with just cause in defending the will.

## Analysis

**A.    The trial court did not abuse its discretion in permitting Dr. Adhia to testify as an expert.**

In his first issue, Donovan argues that the court abused its discretion in allowing Dr. Adhia to testify as an expert because his testimony was inadmissible under Texas Rules of Evidence 702 and 705(c).

### 1.    Standard of review and applicable law

A trial court's admission of expert testimony is reviewed for an abuse of discretion. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

Texas Rule of Evidence 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Before an expert states an opinion or discloses the underlying facts or data, an adverse party in a civil case may be permitted to examine the expert about the underlying facts or data. Tex. R. Evid. 705(b). This examination must take place outside the jury's presence. *Id.* An expert's opinion is inadmissible if the underlying facts or data do not provide a sufficient basis for the opinion. Tex. R. Evid. 705(c). Thus, an expert's testimony must be both relevant to the issues and based on a reliable foundation. *Robinson*, 923 S.W.2d at 556.

### 2.  Donovan's objection and the court's ruling

Contestants presented Dr. Adhia as an expert witness. At the beginning of Dr. Adhia's testimony, the court allowed Donovan to voir dire Dr. Adhia outside the jury's presence. Donovan objected to Dr. Adhia's testimony on the grounds that he lacked a sufficient basis for his opinions under rule 705(c) and because his testimony would not assist the jury to understand the evidence or determine a fact issue. Tex. R. Evid. 702. The court sustained Donovan's objections and ruled that Dr. Adhia was not allowed to testify "as an expert on the opinion that he [was] retained to give" and could not give an opinion on "testamentary capacity or undue influence." Contestants' attorney then asked if Dr. Adhia was "allowed to testify on alcoholism." The court responded that such a topic had not "been presented to [the court] nor proven up."

After a recess, Contestants questioned Dr. Adhia further in connection with "the Court's ruling that strikes Dr. Adhia as a person who could assist the jury

under [rule] 702 in regards to the elements of testamentary capacity as they relate in a medical basis to a person who has had two strokes, who is dependent on alcohol, who has untreated depression and treated depression, who has a panic disorder, and who is totally and completely dependent on others." Contestants "reoffer[ed]" Dr. Adhia on the issue of "how a stroke, alcoholism, lack of medication, how panic disorder and the drugs thereto, and alcohol withdrawal affect a person's ability to handle the activities of daily living." Donovan objected, arguing that Dr. Adhia was "not qualified to testify as an expert [and] lacks the experience," that "the underlying facts or data that has been provided does not provide a sufficient basis for his opinion," and that the "issues he desires to speak on are within the general knowledge and experience of an average juror and is not something specific to an expert."

The court left its initial ruling undisturbed regarding "testamentary [and] contractual capacity and undue influence"—Dr. Adhia was not permitted to offer opinions on those ultimate issues. However, the court changed its ruling in one respect by allowing Dr. Adhia to testify "about how the strokes, the medications[,] and the alcohol had an effect on Mr. McClure's difficulties of daily living and instrumental daily living." On appeal, Donovan challenges the reliability, relevance, and prejudice, of Dr. Adhia's testimony.

3.      Dr. Adhia's limited expert testimony was reliable

Donovan complains that Dr. Adhia's testimony was unreliable because he did not review all of Jack's medical records and relied on statements from Jack's family and friends.

The Supreme Court of Texas has enumerated a list of factors to be used in determining the reliability of expert testimony: (1) the extent to which the theory has been tested; (2) the extent to which the technique relies upon the subjective

36

interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory. *Robinson*, 923 S.W.2d at 557. These factors, however, do not always apply to expert testimony, because they do not always fit. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). In some instances, the expert's skill and experience may support a finding that his testimony is reliable and relevant. *Id.* In cases like this, the trial court may consider whether there exists too great of an analytical gap between the data and the expert's opinion. *Id.* at 727.

Dr. Adhia reviewed records and affidavits in addition to interviewing several individuals. The records reviewed included medical records from Jack's primary care doctor and the medical examiner's report from Jack's autopsy. Dr. Adhia explained that, according to those records, Jack had suffered at least one stroke (although his family told Dr. Adhia that Jack had likely had two strokes), had generalized anxiety disorder, and had hypertension. Jack also suffered from chronic alcoholism—which was identified as contributing to his death—and was sedentary and disabled. Jack did not regularly seek medical care and often failed to take prescribed medications, choosing to self-medicate by drinking alcohol instead.

Based on this information, Dr. Adhia opined that Jack was incapable of performing or had difficulty performing basic and instrumental activities of daily living. He described "basic" activities of daily living as "simple" tasks, like toileting, bathing, and walking. "Instrumental" activities are a "higher form" of daily living, like shopping, taking medications, and using transportation. Jack

needed both physical and mental assistance with performing tasks, such as cleaning himself and his house, visiting the bank, purchasing alcohol, or communicating with his attorney. Jack was highly dependent on others, specifically Donovan, due to Jack's medical conditions, psychiatric conditions, and substance use disorder. Jack's "excessive alcohol intake" impacted his medical condition and his ability to perform activities of daily living, as evidenced by the fact that Jack "was basically in his bed much of the time."

We disagree with Donovan that an analytical gap exists between Dr. Adhia's opinions and the information on which he relied. We hold that the trial court could have reasonably concluded that Dr. Adhia's medical experience and knowledge, coupled with his review of the medical records, demonstrated that the opinions he drew from those records were reliable. *See, e.g.*, *Gammill*, 972 S.W.2d at 727; *In re Est. of Robinson*, 140 S.W.3d 782, 792 (Tex. App.—Corpus Christi 2004, pet. denied) (trial court did not abuse its discretion by admitting doctor's expert opinion testimony in will contest); *accord also Miller v. Churches*, 418 S.W.3d 749, 753 (Tex. App.—Dallas 2013, no pet.) (doctor's opinions were sufficiently based on the medical records).

The gist of Donovan's reliability challenge is that Dr. Adhia's testimony was speculative because he had not seen all of Jack's medical records. When asked during voir dire whether he reviewed all of Jack's medical records, Dr. Adhia explained that he likely had not and, further, the reason a greater volume of medical records did not exist was because Jack did not regularly seek medical care due to his dependence on others: "I believe one of the factors is there's not a volume of medical records, but I think that speaks to [Jack's] inability to perform the [activities of daily living] and also the instrumental activities of daily living. So, he was highly dependent on others, and unfortunately it was very difficult to

38

get him to see the doctor." Dr. Adhia also admitted that he did not review the bank records showing the beneficiary designations, communications in which Darla thanked Donovan for helping Jack complete his legal documents, or a portion of Hoffman's fee invoices in which Hoffman stated that Jack was "cogent, aware, and clear at all times."

Dr. Adhia's limited testimony regarding the "perfect storm" created by stroke, medications, and alcoholism, was based on his training and experience as a forensic psychiatrist, as well as on the information contained in the records provided to him. The fact that Dr. Adhia did not review every possible record goes to the weight of his testimony, not its admissibility,[3] and did not render it speculative. *See, e.g.*, *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918, 924 (Tex. 1977) (attack on figures underlying the expert's opinion testimony goes to the weight rather than to the admissibility of the testimony); *Regent Care Ctr. of San Antonio, L.P. v. Detrick*, 567 S.W.3d 752, 764 (Tex. App.—San Antonio 2018) (expert opinion concerning ambulance charges was based on review of records and related billing entries; the fact that expert did not additionally review actual invoices went to weight of testimony and did not render testimony conclusory or speculative), *aff'd sub nom.*, 610 S.W.3d 830 (Tex. 2020); *Cairus v. Gomez*, No. 03-06-00225-CV, 2006 WL 3523797, at *5 (Tex. App.—Austin Dec. 6, 2006, pet. denied) (mem. op.) (expert testimony was sufficiently reliable when expert reviewed textbooks, literature, and patient's medical records and expert used his own extensive experience in surgery); *see also Am. Cas. Co. of Reading, PA v. Zachero*, No. 11-07-00183-CV, 2008 WL 5205642, at *4 (Tex. App.—Eastland Dec. 11, 2008, no pet.) (mem. op.) (expert's testimony was sufficiently reliable when it was based upon review of medical records, physical examination, and the

---

[3] According to appellees, Dr. Adhia reviewed all the medical records produced in the case, none of which were produced by Donovan.

objective data showing the progression of patient's conditions); *McKinney Indep. Sch. Dist. v. Carlisle Grace, Ltd.*, 222 S.W.3d 878, 882 (Tex. App.—Dallas 2007, pet. denied) (lack of supporting market data is factor for jury to consider in determining credibility of expert opinion). The information on which Dr. Adhia based his opinions was sufficiently reliable to support his ultimate conclusions. *Cf., e.g.*, *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997) ("If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable.").

Donovan also challenges Dr. Adhia's reliance on information received from Jack's family members. According to Dr. Adhia, Denise said that Jack changed the beneficiary designations on January 31; however, the record established that Jack actually made the changes on February 1. Dr. Adhia also testified that he reviewed an affidavit from Helen, but the affidavit was not notarized and he was unaware that she was legally blind. Any inconsistency in the information provided to Dr. Adhia again goes to weight, not the admissibility of his testimony. *See, e.g.*, *LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 479 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("We hold that the credibility of the patient history Burke gave to Mims was a fact issue that goes to the weight, rather than the admissibility, of Mims's causation opinion.").

The remainder of Donovan's reliability argument focuses mostly on portions of Dr. Adhia's testimony before the jury and alleged contradictions or omissions therein. But this evidence was not before the trial court at the time of ruling on the threshold admissibility question, and so we do not factor it into our review. *See Hornell Brewing Co. v. Lara*, 252 S.W.3d 426, 429 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that determination of whether trial court abused its

discretion was limited to information available to trial court at time of ruling, not subsequent events); *Amigos Meat Distribs., L.P. v. Guzman*, 526 S.W.3d 511, 523 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

In making the threshold admissibility determination, the trial court is not to determine whether an expert's conclusions are correct, but only whether the analysis used to reach them is reliable. *Gammill*, 972 S.W.2d at 728. Based on the record developed during the voir dire hearing, we conclude that the trial court did not abuse its discretion in finding that Dr. Adhia's expected testimony, as limited by the court, would be reliable.

4. Dr. Adhia's testimony was relevant

Donovan also challenges the relevance of Dr. Adhia's testimony and argues that Dr. Adhia's testimony did not assist the jury "in any way." We disagree. Although Dr. Adhia was not permitted to offer his opinion on Jack's testamentary or contractual capacity or his susceptibility to undue influence, Dr. Adhia testified regarding the physical and mental effects of Jack's ailments and his alcoholism on his ability to reason and to perform daily and instrumental functions. The nature and extent of Jack's medical conditions, the extent and effects of Jack's chronic alcoholism in the years just before his death, and his ability or inability to reason and perform a variety of essential living functions were all facts in dispute. *See* Tex. R. Evid. 702. The jury could have relied on Dr. Adhia's testimony to make reasonable inferences as to the ultimate fact questions whether Jack's drinking, medications or lack thereof, and physical ailments destroyed his testamentary or contractual capacity or rendered him susceptible to undue influence. Thus, the testimony was relevant. *See, e.g.*, *In re Est. of Kremer*, No. 09-10-00066-CV, 2011 WL 846137, at *7 (Tex. App.—Beaumont Mar. 10, 2011, pet. denied) (mem. op.) ("Minnie's medical records contain information relevant to Minnie's physical

41

status during a period of time relevant to whether she lacked testamentary capacity or was capable of being unduly influenced, the two issues that were to be decided by the jury.").

     5.     Dr. Adhia's testimony was not unfairly prejudicial

Relevant and reliable expert testimony, however, is nonetheless inadmissible if its probative value is outweighed by, among other things, the danger of unfair prejudice which may result from its admission. *See Robinson*, 923 S.W.2d at 557 ("If the trial judge determines that the proffered testimony is relevant and reliable, he or she must then determine whether to exclude the evidence because its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.") (internal quotation omitted) (citing Tex. R. Evid. 403); *see also Kelly v. State*, 824 S.W.2d 568, 572 n.11 (Tex. Crim. App. 1992) (noting that rule 702 incorporates rule 402 and 403 analyses).

Donovan argues that Dr. Adhia's testimony, even if relevant, was unfairly prejudicial because it confused the issues, misled the jury, and presented needless cumulative evidence. After reviewing the record, however, we hold that the trial court reasonably could have concluded that the probity of Dr. Adhia's testimony outweighed the danger of any unfair prejudice.

We overrule Donovan's first issue.

**B.**    **The trial court did not abuse its discretion in admitting the challenged portions of Ron's testimony.**

In his second issue, Donovan argues that the trial court erred in allowing Ron Sands to testify on certain topics because Ron was not qualified as an expert under rule 702. Contestants, however, did not offer Ron as an expert witness, but as a lay witness under rule 701.

Texas Rule of Evidence 701 provides that a lay witness may testify in the form of an opinion or inference that is rationally based upon his perception and is helpful to the jury's understanding of either the witness's testimony or the facts of the case. Tex. R. Evid. 701. The requirement that an opinion be rationally based on the perceptions of the witness is composed of two parts: (1) the witness must establish personal knowledge of the events from which his opinion is drawn; and (2) the opinion drawn must be rationally based on that knowledge. *See Lopez-Juarez v. Kelly*, 348 S.W.3d 10, 19 (Tex. App.—Texarkana 2011, pet. denied) (citing *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997)).

A party may not, however, present an expert in "lay witness clothing." *See Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 851 and n.2 (Tex. 2011). For purposes of rule 702, a witness testifies as an expert witness when "the witness's testimony, in substance, is based on special knowledge, skill, experience, training, or education in a particular subject." *Id.* at 850. Because the line between who is a rule 702 expert witness and who is a rule 701 witness is "not always bright", the supreme court has stated that "when the main substance of the witness's testimony is based on application of the witness's specialized knowledge, skill, experience, training, or education, then the testimony will generally be expert testimony" within the scope of rule 702. *Id.* at 851.

Contestants asked Ron the following questions to which Donovan objected on rule 702 grounds.

1. "Based on your observation and your experiences, do you believe addiction and alcoholism can affect somebody's ability to reason?" Donovan objected that Ron was "not qualified to make what [sic] statement." The court overruled the objection, and Ron responded, "Yes, I do."

43

2. "Based on your observations regarding alcoholism, do you believe drug addiction and alcoholism had an impact on Jack's brain?" Donovan again argued that Ron was "not qualified" to give that type of testimony, to which Contestants responded that "[i]t's based on his personal observation." The trial judge sustained the objection and said, "Lay a better predicate." Ron did not answer the question.

3. "Based on your observations regarding alcoholism, do you believe addiction and alcoholism had an impact on Jack's brain?" Donovan objected that Ron was not qualified to testify and that Contestants had not "laid a time frame." The judge asked Contestants to "narrow it to a time frame" and sustained the objection. Ron did not answer the question.

4. "In comparing how you saw Jack in 1995 and 2018, based on your observations, did Jack's alcoholism have an impact on his brain?" Donovan objected that Ron was "not qualified to make an expert statement." The trial court overruled the objection, and Ron answered, "Yes, I certainly believe that it had an impact on his brain."

5. "Based on your experience and your observation of Jack, did you observe a mental decline in Jack?" Ron answered, "Well, again, alcohol is a central nervous system depressant. It affects the cerebral cortex of the brain -- " Donovan objected that Ron was not qualified "for this type of testimony." The trial court overruled the objection, and Donovan finished his answer, " -- specifically, the prefrontal cortex of the brain where decision-making is made: judgment, reasoning, analytical skills, IQ, thinking, all of those areas and as well, you know, midbrain where feelings and emotions are impacted as well as urges. And then the

hindbrain, which has to do with just basic life-sustaining functions such as heart rate, blood pressure, respiration, GI, these kinds of things."

6. "Based on your personal observations and your experiences related to Jack, do you believe alcoholism can lead to insanity?" Donovan objected that Ron was not qualified to make that type of medical conclusion. The trial judge sustained the objection and said there had been no discussion of insanity. Ron did not answer the question.

7. "How would the duration in terms of years affect, in your opinion as you observed Jack, Jack's brain?" Donovan objected on the "failure to lay a predicate as to this type of testimony from this witness." Contestants responded that Donovan opened the door to such testimony during cross-examination by asking Ron about the anesthetic effect on the brain. The court overruled the objection, and Ron responded, "The anesthetic [e]ffect on the brain especially is that which is progressive which corresponds with alcoholism because it is a progressive disease. So, consequentially, left untreated, we find that it has a progressive adverse effect upon the functions of the brain and those functions that I mentioned earlier that had to do with prefrontal cortex, midbrain, and hindbrain. Those kinds of things are adversely affected by the anesthesia of alcohol being a central nervous system depressant disorder."

Questions 2, 3, and 6 present no basis for reversal because the trial court sustained the objections and Ron did not answer. *See Virlar v. Puente*, 613 S.W.3d 652, 674 (Tex. App.—San Antonio 2020, pet. granted); *Shaw v. Triple J Mowers, Inc.*, No. 10-04-00262-CV, 2006 WL 348427, at *7 (Tex. App.—Waco Feb. 15, 2006, no pet.) (mem. op.) (explaining that there was no adverse ruling to review because court sustained objection to question) (citing Tex. R. App. P. 33.1).

Question 1 sought Ron's opinion based on his perceptions and experiences. This could include his perceptions and experiences with Jack and with others he has treated or counseled as a licensed mental health professional. Ron discussed his observations and interactions with Jack and others addicted to alcohol, thus demonstrating the necessary personal knowledge of events from which his opinion was drawn. *See Solomon v. State*, 49 S.W.3d 356, 364 (Tex. Crim. App. 2001) (once the proponent of an opinion establishes personal knowledge of the facts underlying the opinion, he has satisfied the perception requirement of rule 701); *Fairow*, 943 S.W.2d at 898. Moreover, that excessive consumption of alcohol and alcoholism can, generally speaking, affect somebody's ability to reason is not beyond the common knowledge of laymen and does not call upon specialized knowledge. *See, e.g.*, *Bettis v. Bettis*, 518 S.W.2d 396, 399 (Tex. App.—Austin 1975, writ ref'd n.r.e.) (rejecting argument that the "residual effect of toxic by-products of alcohol" and "the ability of a chronic alcoholic to dissimulate and appear sober" are "matters beyond a layman's ken");[4] *see also Ticknor v. Doolan*, No. 14-05-00520-CV, 2006 WL 2074721, at *3 (Tex. App.—Houston [14th Dist.] July 27, 2006, pet. denied) (mem. op.) ("Although the trial court acts as a

---

[4] In *Bettis*, the court rejected the appellant's argument that chronic alcoholism's effect on testamentary capacity had to be determined solely by medical expert testimony. *Id.* at 399. As the court stated,

> We are of the view that alcoholism like other illnesses or senility may effect one's testamentary capacity. And in order to determine testamentary capacity, or lack thereof, the finder of fact should be given all of the relevant and competent testimony regarding the mental condition of the testator, including the fact of alcoholism and its effects upon him. The fact that Bettis was shown to be an alcoholic and that much of the medical testimony was that his condition prevented his having testamentary capacity, did not destroy the efficacy of appellee's lay and medical testimony that he had testamentary capacity. Appellant's expert testimony was not conclusive of the issue and simply created a question of fact which the jury resolved against her.

*Id.* at 399-400.

gatekeeper in assessing the reliability of scientific methods on which an expert opinion is based, such assessments are not preconditions to the admission of factual evidence of alcohol consumption . . . or non-expert opinions regarding intoxication.") (citing *Vaughn v. State*, 493 S.W.2d 524, 525 (Tex. Crim. App. 1972) ("It is elementary in Texas that one need not be an expert in order to express an opinion upon whether a person he observes is intoxicated.")). Under the facts of this case, we conclude Ron's affirmative response to Question 1, as based upon his personal experience and perception, was helpful to the jury for the purpose of assisting it to understand his testimony as well as to better comprehend the facts of the case. Tex. R. Evid. 701. This question did not trigger scrutiny under rule 702, and the court did not abuse its discretion in overruling Donovan's objection based on that rule.

Presuming for the sake of argument that Question 1 called upon Ron to apply specialized knowledge or training, we conclude the trial court reasonably could have ruled that Ron was shown to be sufficiently qualified to answer the particular question.[5] Thus, the trial court did not abuse its discretion in overruling a rule 702 objection for this alternative reason.

In contrast to Question 1, Questions 4, 5, and 7—coupled with Ron's answers regarding the specific effects of alcohol on a person's brain—implicated at least in part his specialized knowledge, experience, and training as a mental health professional and his graduate degree in allied health services with a specialization

---

[5] Ron has undergraduate degrees in psychology and sociology, a graduate degree in clinical psychology with specialization in criminal justice and corrections, and another graduate degree in allied health services with specialization in alcoholism substance abuse. He is a licensed mental health professional and a certified employee assistance professional. His education and employment as a mental health professional spanned fifty-five years and included employment at correctional institutions, the National Naval Medical Center, and the Naval Regional Medical Center.

in alcoholism substance abuse. The opinions sought were not based solely on Ron's perceptions and experiences. Presuming therefore that these questions called for expert opinions, *see Reid Rd. Mun. Util. Dist. No. 2*, 337 S.W.3d at 851, and further presuming that Ron lacked the necessary qualifications to offer the opinions he did, we are nonetheless unpersuaded that their admission constitutes reversible error.

"An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1; *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 883 (Tex. 2014).

Error in the admission of objected-to evidence is generally harmless if the complaining party allows the same or similar evidence to be introduced without objection, unless the complaining party obtains a running objection. *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235-36 (Tex. 2007); *Katy Int'l, Inc. v. Jiang*, 451 S.W.3d 74, 94 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Donovan did not secure a running objection and other, similar evidence was admitted without objection. For example, during cross-examination, Ron testified without objection that an alcoholic has a "blurred understanding" based upon "the anesthetic effect of the alcohol," which "impacts and affects the cognitive areas of the brain." According to Ron, alcoholism is a "brain disease." This unobjected-to testimony is substantively similar to Ron's testimony in response to Questions 4, 5, and 7. Ron's testimony was also in a similar vein to the earlier testimony from Dr. Adhia. Dr. Adhia testified without objection that "[a]lcohol makes the depression worse. The brain injury make[s] the alcohol, you

48

know, worse. . . . [O]ne mak[es] [the] other worse." Dr. Adhia also testified that alcoholism and marijuana use could affect Jack's "cognitive abilities." The erroneous admission of evidence that is merely cumulative of properly admitted evidence is harmless error. *Gee v. Liberty Mut. Fire Ins., Co.*, 765 S.W.2d 394, 396 (Tex. 1989).

Additionally, error in the admission of evidence is generally not grounds for reversal unless the appellant can demonstrate that, considering the entire record, the judgment turns on the challenged evidence or the challenged evidence is controlling on a material, disputed, and dispositive issue. *See Kia Motors*, 432 S.W.3d at 883; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *Katy Int'l, Inc.*, 451 S.W.3d at 93; *Elliott v. Elliott*, 21 S.W.3d 913, 922 (Tex. App.—Fort Worth 2000, pet. denied). Viewing the full breadth of the substantial evidence introduced regarding Jack's alcoholism and its effects, we are hard-pressed to say that Ron's responses to these few questions were controlling or that the judgment turned on them.

Finally, we note that with respect to Question 7, Donovan opened the door to that topic during his cross-examination by asking Ron about the anesthetic effect of alcohol on the brain. The trial court could have reasonably overruled the objection on this ground as well. *See Sw. Elec. Power Co. v. Burlington N. R.R.*, 966 S.W.2d 467, 473 (Tex. 1998) (noting that a party opens the door to the admission of otherwise objectionable evidence offered by the other side when it offers evidence of a similar character); *Ramos v. Walters*, No. 01-16-00514-CV, 2017 WL 2545095, at *5 (Tex. App.—Houston [1st Dist.] June 13, 2017, no pet.) (mem. op.).

To the extent Donovan complains of portions of Ron's testimony other than what we have discussed, we need not address those complaints because they were

49

not preserved by a timely rule 702 objection in the trial court on lack of qualification grounds. Tex. R. App. P. 33.1. We have addressed the specific questions and answers to which Donovan lodged objection and about which he complains on appeal.

We overrule Donovan's second issue.

## C. Sufficiency of the Evidence

In his third issue, Donovan challenges: the factual sufficiency of the evidence supporting the jury's findings that Jack lacked testamentary capacity and contractual capacity and that Donovan unduly influenced the beneficiary designations; the legal and factual sufficiency of the evidence supporting the jury's finding that Donovan unduly influenced Jack's will and that the will was based on a mistake of fact; and the legal sufficiency of the evidence supporting the jury's finding on Contestants' conversion claim. In his fourth issue, Donovan argues that factually insufficient evidence supports the jury's finding that he did not defend the will in good faith and with just cause.

### 1. Standards of review

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *See id.* at 827. To sustain a challenge to the legal sufficiency of the evidence supporting a jury finding, the reviewing court must find that: (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact;

50

(3) there is no more than a mere scintilla of evidence to prove a vital fact; or (4) the evidence conclusively established the opposite of a vital fact. *Ramirez*, 159 S.W.3d at 903.

When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the finding. *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When a party attacks the factual sufficiency of an adverse finding on an issue on which it had the burden of proof, the party must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). And when a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.). We consider all the evidence, but we will not reverse the judgment unless "the evidence which supports the [] finding is so weak as to [make the finding] clearly wrong and manifestly unjust." *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

We apply these standards mindful that this court is not a fact finder. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The trier of fact is the sole judge of witnesses' credibility and the weight afforded their testimony. *City of Keller*, 168 S.W.3d at 819-20; *GTE Mobilnet*, 61 S.W.3d at

51

615-16. Therefore, we may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder, even if the evidence would also support a different result. *GTE Mobilnet*, 61 S.W.3d at 615-16.

## 2. Application

### a. *Testamentary capacity*

We begin with Donovan's challenge to the factual sufficiency of the evidence supporting the jury's finding that Jack lacked testamentary capacity when signing the will. In a will contest filed after the will is admitted to probate, the burden of proof is on the party contesting the will to establish that the testator lacked testamentary capacity. *Lee v. Lee*, 424 S.W.2d 609, 610 n.1 (Tex. 1968); *Horton v. Horton*, 965 S.W.2d 78, 85 (Tex. App.—Fort Worth 1998, no pet.).

The jury charge asked:

> Did Jack McClure lack testamentary capacity to sign the Last Will and Testament dated February 12, 2019?
>
> INSTRUCTION:
>
> A decedent lacks testamentary capacity if, at the time the decedent signs a will, the decedent—
>
> 1. lacks sufficient mental ability to understand that he is making a will, or
>
> 2. lacks sufficient mental ability to understand the effect of his act in the making of the will, or
>
> 3. lacks sufficient mental ability to understand the general nature and extent of his property, or
>
> 4. lacks sufficient mental ability to know his next of kin and natural objects of his bounty and their claims on him, or
>
> 5. lacks sufficient memory to collect in his mind the elements of the business to be transacted and to be able to hold the elements long enough to perceive their obvious relation to each other and to form a reasonable judgment as to these elements.

52

You may consider evidence of Jack McClure's mental condition at times other than on February 12, 2019, only if it demonstrates a condition that affects his testamentary capacity and that was persistent and likely present on February 12, 2019.

Answer "Yes" or "No"

The jury answered "Yes."

Because Contestants bore the burden of proof and secured a finding in their favor, Donovan's appellate burden is to show that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett*, 489 S.W.3d at 66.

A testator has testamentary capacity when he has sufficient mental ability to understand that he is making a will, and the general nature and extent of his property. *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex. App.—Houston [14th Dist.] 2000, no pet.). He also must know the natural objects of his bounty, the claims upon them, and have sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them. *Id.* In a will contest, the pivotal issue is whether the testator had testamentary capacity on the day the will was executed. *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968). However, evidence of the testator's state of mind at other times can be used to prove his state of mind on the day the will was executed provided the evidence demonstrates a condition affecting his testamentary capacity was persistent and likely present at the time the will was executed. *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983). "Incapacity to make a will . . . is a subtle thing, and must be established to a great extent, at least so far as lay witnesses are concerned, by circumstantial evidence." *In re Boultinghouse's Estate*, 267 S.W.2d 614, 619 (Tex. App.—El Paso 1954, writ dism'd).

The jury heard conflicting evidence relating to whether Jack had testamentary capacity when he signed the will on February 12, 2019.

Larry Click spoke with Jack "right around" the day he died, and Jack never mentioned that he had signed a will. Jack never told Larry that he had changed his mind about the love for his family or that he had decided to leave everything to Donovan. After Jack's death, Larry told Donovan that Jack never intended for one person to "get everything." Larry "kind of insinuated that Jack wasn't in the condition to authorize a new will; and Donovan told [Larry] to get off the property."

Dr. Adhia, based on his review of Jack's medical records and his discussions with Jack's family and friends, testified that Jack likely had impaired cognition and lacked the ability to make life-changing decisions. Jack had at least one stroke, in 2017. According to Dr. Adhia, a stroke often involves brain injury and makes a person more susceptible to the effects of alcohol and marijuana, both of which Jack used regularly. Jack had difficulties with instrumental daily activities, such as communicating. He required assistance to communicate with Hoffman. Jack also required assistance to purchase alcohol.

Jack was taking anxiety medication but, when it ran low, would drink more alcohol as a form of self-medication. He had fallen recently before his death and was sedentary and disabled. He had hypertensive heart disease with heart failure, panic disorder, panic attacks, and depression. Jack died of hypertensive arteriosclerotic cardiovascular disease, with chronic ethanolism or alcoholism as a contributing factor. Donovan told responding officers on the day of Jack's death that "Jack Allen McClure self-medicated with alcohol and marijuana." Donovan confirmed that Jack was "a heavy drinker."

54

Mike McClure testified that Jack experienced dizzy spells and began staying in bed all day. Mike believed Jack began to decline mentally around 2018 or 2019. Jack was not active, was not eating properly, and started drinking a lot. Jack would have three or four glasses of vodka and orange juice in a day, at least in Mike's presence. Mike assisted Jack with writing checks to pay some bills; Mike would write out the checks and Jack would sign them. Jack could not write and could not fill out the checks himself. In January 2019, Mike texted Hoffman that he was concerned about Jack because Jack "was slowly slipping away."

Cammy Mason-Garrison last saw Jack in 2013 but continued to speak to him over the phone. Jack seemed fine "until about the last year or so." Jack would "loop" or repeat conversations from the beginning "as if [they] had just picked up the phone."

James Meriwether testified that Jack began to "decline" after the 2011 diverticulitis surgery. In 2018, Jack "appeared to be deteriorating further." Jack was frail and childlike.

In 2018, when Jack appeared childlike, Denise would not have felt comfortable taking a check from him, asking him to sign a legal document of any kind, or taking him to the bank and having him change account beneficiaries. In 2018 and 2019, Denise felt like Jack had "passed the point of handling his own affairs." Denise knew that Jack needed help with tasks like writing checks and that Mike was helping Jack "get a will done." At that point, Jack "couldn't do anything for himself, really. He didn't even cook food."

After his diverticulitis in 2011, Jack had hallucinations and nightmares of going to hell. According to Denise, these hallucinations persisted in 2018.

Denise saw Jack and Donovan on February 1, 2019, when they "had just come from some banks." Donovan was "excited," while Jack "didn't say anything. He just looked worn out, sweaty, red." Denise believed that Jack "absolutely lacked the capacity" to execute a will in February 2019: "[H]e didn't have the ability the last six to eight months of his life to be making decisions."

Jack's will contained notable mistakes. In particular, Donovan was the only person identified as "family." Also, Denise's married name was misspelled, and Jack had never misspelled her name before. Denise was "confident Jack would never have" made a will "without a backup beneficiary had he been of sound mind. If he had any mental acuity, he would have known there needed to be a backup." According to Donovan, who was present when Jack signed the will, Hoffman did not read the will to Jack and Jack did not ask any questions prior to signing.

According to Darla, who helped Helen draft power of attorney forms prior to Jack's death, Helen wanted Donovan, Darla, and Denise to have "equal" powers. Helen did not want Jack to be named "because of his incapacitated state. He couldn't take care of his own affairs, much less hers."

Darla testified that she told Helen and Ron, around the time Jack started the will drafting process, that Jack "was not of sound mind to do a will. He should not be signing anything." Darla testified that Jack "was not of sound mind to do what he did. Sign financial documents, change the banking institution." Darla still would have contested the will, even if it left everything to everyone, because she did not believe Jack was of sound mind to execute a will.

Darla saw Jack on February 20. He was exhausted and looked pale and frail. "He had no affect on his face. It was -- it was just flat and to try to have a conversation with him, again, he was just very quiet. You could ask him questions and he would answer you, but he was not engaging."

56

Natalie Hannum testified that Jack obtained medical care for one stroke, but the family saw things in 2017 or 2018 "that let [them] know that they [sic] were multiple strokes happening." Those strokes or episodes were not documented because Jack did not seek medical care for them. Jack suffered a "dramatic decline . . . It was cognitive. . . . Mental . . . judgment, safety awareness, memory, everything." When Natalie spoke with Jack, "you could see that he was searching for words. He couldn't really string conversations together anymore. You'd throw something at him, but you didn't get anything back." Natalie suggested physical therapies for Jack to try to help with his arm and his dizziness, but the next time she talked to him, "he wouldn't remember."

Ron observed a mental decline in Jack. Jack became more childlike around 2017 or 2018. If Jack handed Ron a check in 2017 or 2018, Ron would not have accepted it because he did not believe that Jack was capable of cognitively managing his own affairs or that Jack would be "aware of the purpose and motivation behind why he was providing [Ron] a check."

Barbara Morrison, one of the witnesses, testified, "We just signed the documents. We witnessed him signing and us signing." She did not recall any conversation with Lullo or statements made by Lullo, nor did she recall Hoffman making any statements. Morrison did not witness any communications between Jack and Hoffman.

Courtney Lullo, Hoffman's office manager, did not recall swearing anybody or placing anyone under oath. Lullo did not recall any conversation while she was in the room. Lullo did not recall if Hoffman asked any questions during the signing. She did not swear the witnesses as to whether Jack was of sound mind. Lullo did not go through the questions on the self-proving affidavit with Jack or the witnesses.

In contrast to the above evidence, the jury also heard evidence indicating that Jack may have had testamentary capacity on February 12, 2019. This evidence included testimony from several witnesses who unanimously agreed that Jack always knew who his family was and recognized his family members. Also, Jack's doctor noted in his medical records that he was alert and oriented and his cerebral function was normal, as of July 2018. The bank managers did not notice anything concerning about Jack's demeanor when he made the beneficiary changes.

According to Hoffman, "Jack told [Hoffman] he wanted the will to provide -- he told [Hoffman] what he wanted the will to provide, about all of these things . . . . [Jack] wanted Donovan to be the executor and the beneficiary." Jack also wanted Mike to get the Oldsmobile and Caley to be a beneficiary of a CD. Jack told Hoffman what he wanted done and was straightforward about his desires. Donovan did not instruct Hoffman that he was to be the beneficiary of the accounts. All of "that part of the communication" came from "Jack alone."

Donovan said that Jack drove, alone, to his shop and met with a realtor, on the day before he died, in contrast to Mike's testimony that Jack was in bed the day before he died. Jason Kieschnick believed that Jack understood the nature of the conversation regarding selling the shop on the day before he died.

On the day of will signing, Hoffman said that Jack appeared "calm and collected and happy, kind of content, relieved to be getting this done." He never appeared childlike to Hoffman. Hoffman "basically took [Jack and the witnesses] through the -- through the procedures of the signing the will and where the witnesses were going to attest to it and all that."

Hoffman said he had a private conversation with Jack before the will signing:

58

I took him through the entire will. I took him through the four related documents: the powers of attorney, the durable power of attorney, the physician's directive, and explained each one, line by line and made sure he understood each one. Then when we were finished with all that and I told Courtney to go and get the witnesses, I turned to Jack and it was just he and I in the room at the time and I asked him one question. I asked him, Jack, are you sure this is what you want to do? . . . He turned to me and he looked at me and said, Yes, because I know that Donovan will do the right thing.

Lisa Robbel testified that Hoffman went through "the whole will thing" with Jack and asked the questions that Robbel described as typical of a normal will signing. Jack responded appropriately in her opinion; "he seemed fine." Robbel testified that Jack agreed, when asked, that he willingly made and executed the will.

Donovan testified that it was "totally ridiculous" to suggest that Jack did not know who his family was or that he was not aware of his property. Jack's "mental capacity was the same the day he died that it was 30 years ago."

Considering all the evidence both in support of and against the finding, the jury reasonably could have found that Jack lacked testamentary capacity on February 12, 2019. Several witnesses testified that Jack began to decline mentally at some point in 2018. By the beginning of 2019, Mike felt that Jack was "slipping away." According to Dr. Adhia, Jack suffered from heart disease, panic disorder, and chronic alcoholism. His stroke likely led to impaired cognition and Jack was unable to do basic daily tasks without assistance. Donovan admitted that Jack's symptoms "progressed" over time after the stroke. Several witnesses testified that Jack was not of "sound mind" to make major decisions in 2018 and continuing into 2019. When witnesses spoke to Jack in person or over the phone, it was difficult or impossible to engage Jack, who "looped" in his train of thought or was "flat," with "no affect." In short, the evidence supports a finding that Jack developed a

persistent condition or conditions affecting his testamentary capacity, which were likely present when the will was executed. *See Croucher*, 660 S.W.2d at 57.

Although Donovan, Hoffman, and Robbel testified that Jack seemed "normal" at the will signing, the jury could consider the fact that Donovan was a named beneficiary under the will and therefore an interested witness at trial. Because they can observe a witness's demeanor, juries are given great latitude as fact finders to believe or disbelieve a witness's testimony, particularly when the witness is interested in the outcome. *Le v. Nguyen*, No. 14-11-00910-CV, 2012 WL 5266388, at *8 (Tex. App.—Houston [14th Dist.] Oct. 25, 2012, no pet.) (mem. op.) (citing *In re Doe 4*, 19 S.W.3d 322, 325 (Tex. 2000)). Though they were not interested trial witnesses, the same can be said about Hoffman's and Robbel's testimony, particularly given Lullo's controverting testimony that Jack was not questioned prior to signing the will. *See Le*, 2012 WL 5266388, at *8. Therefore, the jury could reasonably have chosen to disbelieve or discount all three eyewitnesses' testimony regarding Jack's mental capacity at the time he signed the will. *See id.*

The jury could also have considered Jack's failure to recognize factual mistakes in the will and related documents, including his failure to list all of his family members and the misspelling of his sister's last name, as evidence that Jack lacked testamentary capacity when he signed the will. *See Gayle v. Dixon*, 583 S.W.2d 648, 651 (Tex. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.); *see also Michon v. Avalla*, 19 S.W. 878, 880 (Tex. 1892) ("Acts occurring before or after or at the time of the execution of the instrument tending to throw light upon the mental condition of the party, are admissible.")).

We conclude that the evidence is factually sufficient and the finding that Jack lacked testamentary capacity on February 12, 2019 is not so contrary to the

overwhelming weight of evidence as to be clearly wrong and unjust. *See Sebesta v. Stavinoha*, 590 S.W.2d 714, 718 (Tex. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (holding that even though the evidence was disputed, it was sufficient to support the jury's finding that the testatrix did not have testamentary capacity on the date the will was executed). We overrule this part of Donovan's third issue.

Having reached this conclusion, we need not address Donovan's alternative arguments that the evidence does not support a finding that Jack was unduly influenced in signing the will or that the will was a result of mistake of fact. *See* Tex. R. App. P. 47.1.

### b.    *Contractual capacity*

We next turn to Donovan's argument that the evidence is factually insufficient to support the jury's finding that Jack lacked contractual capacity to sign the six challenged beneficiary designation forms.

The jury charge asked:

> Did Jack McClure lack the capacity to sign the below – identified Beneficiary Designation forms?

> ### INSTRUCTION

> Jack McClure lacked contractual capacity to create a beneficiary designation form if he lacked sufficient mind and memory to understand the nature and consequences of his acts and the business he was transacting.

> ### FURTHER INSTRUCTION

> The proper inquiry is whether Jack McClure had capacity on the dates he executed the Beneficiary Designation forms at issue. You may also consider Jack McClure's state of mind at other times if it tends to show Jack McClure's state of mind on the date the Beneficiary Designation Form was signed.

Answer "Yes" or "'No" by each Beneficiary Designation Form below:

a. Change in beneficiary designation on Texas 1st CD Contract Number ending 1390 in the amount of $112,000 on or about November 2, 2018 from Darla Sands to Donovan Mittelsted.

b. Change in beneficiary designation on Amegy Savings Account Number ending 9320 in the amount of $6,900.00 on or about November 2, 2018 from Denise Meriwether to Donovan Mittelsted.

c. Change in beneficiary designation on Amegy CD Contract Number ending 2333 in the amount of $125,300.00 on or about November 2, 2018 from Denise Meriwether to Donovan Mittelsted.

d. Change in beneficiary designation on BBVA Compass Checking Account Number ending 6783 in the amount of $107,800.00 on or about February 8, 2019 in favor of Donovan Mittelsted.

e. Change in beneficiary designation on TD Ameritrade Stocks account number ending in 4082 valued at $323,000.00 on or about February 1, 2019 in favor of Donovan Mittelsted.

f. Change in beneficiary designation on Amegy account number ending in 0093 valued at $104,401.63 or about February 8, 2019 in favor of Donovan Mittelsted.

The jury answered "Yes" for all six subparts.

Documents executed by one who lacks sufficient legal or mental capacity may be avoided. *Kinsel v. Lindsey*, 526 S.W.3d 411, 419 (Tex. 2017). To have mental capacity, the person executing the instrument must have had sufficient mind and memory to understand the nature and effect of his act at the time of the document's execution. *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.). Capacity may be assessed by considering such factors as (1) the person's outward conduct demonstrating an "inward and causing condition," (2) preexisting external circumstances tending to produce a special mental condition, and (3) the person's mental condition before or after the relevant

point in time from which her mental capacity or incapacity may be inferred. *Sanders v. Sanders*, No. 02-08-00201-CV, 2010 WL 4056196, at *2 (Tex. App.— Fort Worth Oct. 14, 2010, no pet.) (mem. op.).

Here, the same evidence detailed above regarding Jack's lack of testamentary capacity also supports the jury's finding that Jack lacked contractual capacity on February 1, 2019 and February 8, 2019. The jury also reasonably could have found that Jack lacked contractual capacity on November 2, 2018, based on Denise's testimony that Jack did not remember making the beneficiary designation changes on that date together with the other evidence of Jack's medical conditions and alcoholism in 2018. *See Decker*, 192 S.W.3d at 652 (to have capacity, person must have sufficient memory to understand the nature and effect of his act). We hold that factually sufficient evidence supports the jury's finding that Jack lacked capacity to make the challenged beneficiary changes and the finding is not so contrary to the overwhelming weight of evidence as to be clearly wrong and unjust. *See, e.g.*, *Anderton v. Green*, 555 S.W.3d 361, 371-72 (Tex. App.—Dallas 2018, no pet.) (sufficient evidence supported finding that settlor lost mental capacity to manage her property, when witnesses testified that she was unable to recall that she had, one or two days prior, undertaken significant banking transactions). We overrule this part of Donovan's third issue.[6]

---

[6] In the last part of Donovan's third issue, he challenges the legal sufficiency of the jury's conversion finding. Resolution of the issue would not affect the judgment. A plaintiff who establishes conversion is entitled to either (1) the return of the property and damages for its loss of use during the time of its detention or (2) the value of the property. *Wiese v. Pro Am Servs., Inc.*, 317 S.W.3d 857, 862 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The final judgment voids the beneficiary designation forms, vests the funds in Contestants as prior designees, and orders Donovan to turn over and deliver to Contestants the amount of the funds existing in the accounts as of the date of the voided forms. Thus, the remedies for the contractual capacity challenge and the conversion claim are the same, and we need not address Donovan's challenge to the conversion finding. *See* Tex. R. App. P. 47.1.

Based on our holding, we need not address Donovan's alternative argument that insufficient evidence supports the jury's finding that Donovan signed the beneficiary designation forms as a result of undue influence. *See* Tex. R. App. P. 47.1.

### c. *Good faith and just cause*

Estates Code section 352.052(a) provides that a person designated as executor in a will who defends the will or prosecutes any proceeding in good faith and with just cause, whether or not successful, shall be allowed out of the estate the executor's necessary expenses and disbursements in those proceedings, including reasonable attorney's fees. Tex. Est. Code § 352.052. The jury found that Donovan did not act in good faith and with just cause in defending Contestants' will contest, and in his fourth and final issue, Donovan challenges that finding for factual insufficiency. As the party seeking to recover attorney's fees under section 352.052, Donovan bore the burden of proving that he defended the suit in good faith and with just cause. *See In re Est. of Longron*, 211 S.W.3d 434, 437 (Tex. App.—Beaumont 2006, pet. denied) (citing predecessor statute, repealed section 243 of the Texas Probate Code).

Good faith is a question of fact, to be determined under all the circumstances of the case. *Harkins v. Crews*, 907 S.W.2d 51, 62 (Tex. App.—San Antonio 1995, writ denied) (citing *Huff v. Huff*, 124 S.W.2d 327, 330 (Tex. 1939)). Good faith and just cause is a separate jury question, and it is not determined automatically by an affirmative or negative finding on undue influence. *See id.* Therefore, even though we are not reviewing the jury's finding on undue influence, we may still consider whether the evidence supports the jury's finding that Donovan lacked good faith and just cause in defending the will contest.

The jury charge defined "good faith" to mean an action that is prompted by honesty of intention or a reasonable belief that the action was probably correct and defined "with just cause" to mean that the actions were based on reasonable grounds and there was a fair and honest cause or reason for the actions.

Donovan contends that there was no evidence that he acted in bad faith or without just cause in offering the Jack's will to probate or in defending the will. Rather, he argues that "it is reasonable to offer a will for probate especially when the will is that of one's deceased brother and the acts of probating such will and defending it carry out [the brother's] wishes and intent." This argument, however, essentially rehashes his position discussed above, namely that Donovan believed that Jack had testamentary intent.

Although the jury was free to believe Donovan's theory that he acted in good faith in defending the will, the jury was also presented with an alternative theory that Donovan did so in bad faith by singlehandedly concocting and executing a process to gain access to Jack's estate, in contravention of Jack's longstanding desire to leave his estate equally to his family members. The record contains sufficient evidence to support the jury's finding that implicitly accepts the existence of such a scheme. That scheme negates any good faith or just cause in submitting the will to probate or in defending against Contestants' will contest. We conclude that the jury's finding was supported by factually sufficient evidence. *See In re Est. of Scott*, 601 S.W.3d 77, 99 (Tex. App.—El Paso 2020, no pet.); *see also Dildane v. Bonham*, No. 03-07-00631-CV, 2009 WL 638200, at *6 (Tex. App.—Austin Mar. 12, 2009, pet. denied) (mem. op.) ("Given our affirmance of the trial court's finding that Dolly did not have testamentary or contractual capacity at relevant times, and the evidence from which the trial court could have concluded that Mary and Rhonda were the parties actually responsible for the 2003

Will's distribution of property in their favor, we conclude that the trial court did not err in denying Mary's request for attorneys' fees.").

We overrule Donovan's fourth issue.

## Conclusion

Having overruled all of Donovan's dispositive issues, we affirm the trial court's judgment.

/s/    Kevin Jewell
Justice

Panel consists of Justices Jewell, Zimmerer, and Hassan.